Thomas W. **GRIFFITH**, Appellant,

v.

**WHEELING PITTSBURGH STEEL CORPORATION and American Commercial Lines, Inc., Appellant.**

No. 75–1022.

United States Court of Appeals, Third Circuit.

Argued June 5, 1975.

Decided Aug. 11, 1975.

Certiorari Denied Jan. 12, 1976. See 96 S.Ct. 785.

Thomas L. Cooper, Gilardi & Cooper, Pittsburgh, Pa., for appellant Thomas W. Griffith.

Giles J. Gaca, John W. Jordan IV, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., for appellant American Commercial Lines, Inc.

William S. Lerach, Reed Smith Shaw & McClay, Pittsburgh, Pa., for appellee Wheeling-Pittsburgh Steel Corp.

Before SEITZ, Chief Judge, and ALDISERT and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This appeal presents us with issues of first impression concerning the proper construction and application of the negligence remedy created by § 18(a) of the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. No. 92–576, 86 Stat. 1263, 33 U.S.C. § 905(b), *amending* § 5 of the Longshoremen's and Harbor Workers' Compensation Act, ch. 509, § 5, 44 Stat. 1426, 33 U.S.C. § 905 (LHWCA). Because we believe that the district court misapplied § 905(b) of the 1972 amendments in the action below,[1] we reverse and remand for further proceedings.

## I. THE UNDISPUTED FACTS.

Appellee Wheeling-Pittsburgh Steel Corporation (Wheeling) operates a steel mill along the banks of the Monongahela River at Allenport, Pennsylvania. It first employed appellant Thomas Griffith on February 11, 1973, about four months before the date of the injury that was to become the subject of this action. He worked out of a common labor pool in the construction department and was assigned on a daily basis to a variety of land-based jobs. On April 1, 1973 Griffith bid into the hot mill labor pool, where as before he was assigned to various jobs on a daily basis. As part of this pool he was assigned to work at the company's barge landing on the river for

---

1. *Griffith v. Wheeling Pittsburgh Steel Corp.,* 384 F.Supp. 330 (W.D.Pa.1974).

a total of 3¾ days including the date of the accident on May 26, 1973.

On that day, plaintiff was assigned to work with the barge crew at the landing to assist in the loading of two barges. The barge on which the accident was to occur, No. 2730, was owned by defendant-appellant American Commercial Lines, Inc. (American). Three days earlier, on May 23, it had been delivered to Wheeling and was incorporated into the latter's "coal fleet" to await future use. On May 25, No. 2730 was relocated next to the seawall at the barge landing to take on a load of sheet steel which was destined to move down river to Louisville, Kentucky. A second barge, described as a pipe barge, was positioned next to No. 2730, and it too was to be loaded. The pipe barge was positioned immediately next to the seawall, and No. 2730 was lashed alongside further out on the river.

On the morning of the day of the accident, Griffith and the regular rivermen in the barge crew first loaded pipe into the pipe barge. During the loading of the pipe barge, which was completed before noon, Griffith worked on the seawall and barge. No. 2730 was then moved into position for loading by a procedure known as "rounding" in which a crane on the seawall pushed the barges away from the wall permitting the current to turn the boats around in the water so that No. 2730 was situated next to the seawall. Griffith's sole assistance during the procedure involved his throwing ropes from one barge to the other.

The crew then turned to the loading of No. 2730. At that time, Joseph Allfree, the crew's foreman, who was employed as river foreman by Wheeling, became aware that the barge covers were difficult to move. The wheels and track mechanism on which the covers ordinarily roll were without lubrication and were rusty and bent. At about 2:00 p. m. Allfree directed the crew to stop loading the barge and to close the covers. Allfree then returned to his office away from the area. The only other experienced riverman on the crew, Joseph Armstrong, then had difficulty closing one of the covers. A cable was attached from the crane on the seawall to the cover to pull it shut; a second cable was attached to an adjacent cover for leverage. Because eyelets on the stuck cover were missing, the hook at the end of the cable was attached to the lip on the underside of the cover. Both Armstrong and plaintiff were standing on top of the stuck cover when tension was applied to the cable. As the stuck cover began to rise they stepped back onto an adjacent cover, but that cover moved backward and the two men fell into the hold and both were injured.

## II. PROCEDURAL HISTORY AND DECISION BELOW.

Griffith filed an action in August, 1973 against both his employer Wheeling, and against the vessel owner American. He alleged negligence on the part of both, and the unseaworthiness of the vessel. Both defendants denied liability to Griffith, and each cross-claimed against the other for indemnification or contribution. Each defendant then filed a motion for summary judgment in its favor against Griffith, and against each other on the cross-claims. The district court concluded: (1) that Griffith was performing stevedoring duties when injured and was not a seaman; (2) that Wheeling, in possession and control of barge No. 2730, was a vessel owner *pro hac vice;* (3) that the 1972 amendments precluded a claim against the vessel owner for unseaworthiness by a longshoreman performing stevedoring duties; (4) that the 1972 amendments permitted a longshoreman covered by the Longshoremen's and Harbor Workers' Compensation Act to sue the vessel owner for negligence; but (5) that the longshoreman could not sue the vessel owner *pro hac vice,* Wheeling, who employed him to perform stevedoring duties for negligence; and, that (6) American was not entitled to indemnification or contribution from Wheeling. Thus Griffith was left with his workmen's compensation claim against Wheeling, and a negligence action against American.

Both Griffith and American jointly appeal the order granting Wheeling's motion for summary judgment. The district court having determined that the order be entered as a final judgment pursuant to Rule 54(b), Fed.R.Civ.P., we have jurisdiction to entertain this appeal, although Griffith's negligence action against American is still pending.

### III. GRIFFITH'S STATUS AS A SEAMAN.

Griffith argues for relief on alternative grounds. On the one hand he contends that he was entitled to sue Wheeling his employer since he was a member of the crew of the barge when he was injured, and thus was a seaman entitled to a Jones Act remedy against Wheeling and an action for unseaworthiness against both Wheeling and American. On the other hand he argues that if he was not a seaman, he was a longshoreman within the protective scope of the LHWCA, and entitled to a § 905(b) negligence remedy against Wheeling as owner *pro hac vice* of the vessel, and American, the vessel owner. We will first consider the merits of Griffith's contention that he was a Jones Act "seaman."

The district court, after reviewing the deposition testimony of Griffith and other members of the barge crew, concluded that there was "no evidentiary evidence whatsoever . . . to support a finding that the plaintiff was a seaman when injured . . . .", and so granted summary judgment against Griffith and in favor of Wheeling on the Jones Act claim. 384 F.Supp. 235.

With respect to the propriety of summary judgment on the issue of seaman status, a leading treatise states:

"The determination of whether the plaintiff is a seaman under the Jones Act should not be taken from the jury by the trial judge if there is an evidentiary basis for making a finding. When conflicting inferences may be drawn from undisputed underlying facts the determination of whether an individual is a seaman must be made by the factfinder. *Only when there is no evidentiary basis to support a jury finding that a plaintiff was a seaman when injured, can the court's decision of summary judgment for the defendant be sustained as a matter of law.* The standard of review where summary judgment has been granted is strict; the record must negate the probability that evidence calling for a contrary result might be developed at the trial." 2 M. Norris, The Law of Seamen § 664, at 297–98 (3d ed. 1970) (footnotes omitted) (emphasis supplied).

*See also* 6 J. Moore, Federal Practice ¶ 56.17[1], at 2464 (2d ed. 1974).

■ Griffith argues that there was evidence in the record which indicates that at the time of the accident he was doing seaman's work, and points to the following facts as indicia of his seaman status: he was substituting for permanent employees designated as rivermen; his duties included those of a seaman's, he was dressed like a seaman; he received the same rate of pay; he was working on a navigable river when injured; and he was supervised by experienced river workers. (App. at 129a–32a). But these facts standing alone, do not preclude summary judgment. The district court correctly identified the decisive elements necessary of proof in determining who is "a member of a crew" within the meaning of the Jones Act:

"(a) that the ship be in navigation; (b) that there be a more or less permanent connection with the ship; and (c) that the worker be aboard primarily to aid in navigation." 2 M. Norris, The Law of Seamen § 668, at 301 (3d ed. 1970).

*See* 1A Benedict on Admiralty § 21, at 2–15 (7th ed. 1973). The district court concluded that "the vessel upon which Griffith was injured was not in navigation, Griffith had no permanent connection whatsoever with the vessel, and Griffith was not aboard primarily to aid in navigation." 384 F.Supp. at 235. While this holding misinterpreted the "in navigation" requirement, the first point

above, as we shall discuss below, we agree that in the affidavits and depositions on file which make up the record, there is no evidentiary basis which could support affirmative findings with regard to the other two elements, and so affirm the granting of summary judgment against Griffith on the question of his "seaman" status.

■■■ As properly construed, the "in navigation" requirement is used in its broad sense, and is not confined strictly to the actual navigating or movement of the vessel, but instead means that the vessel is engaged as an instrument of commerce or transportation on navigable waters. 2 M. Norris, *supra,* at 301. Indeed, so long as the vessel is upon navigable waters, an injured Jones Act seaman may recover for injuries suffered while on the wharf. *Senko v. La Crosse Dredging Corp.,* 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957); *O'Donnell v. Great Lakes Dredge & Dock Co.,* 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943). Case law indicates that a vessel is "in navigation" although moored to a pier, in a repair yard for periodic repairs, or while temporarily attached to some object. 2 M. Norris, *supra,* at 301–02, and cases cited therein. That the barge is also a "vessel" within the meaning of the Jones Act is also clear. In per curiam opinions reversing dismissals of Jones Act actions, the Supreme Court has extended that remedy so as to permit claims brought for injuries incurred in the construction of a "Texas Tower," *Grimes v. Raymond Concrete Pile Co.,* 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737 (1958), and on an off-shore oil rig, *Gianfala v. Texas Co.,* 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775 (1955). *See The Showboat,* 47 F.2d 286 (D.Mass.1930) (schooner tied to wharf and used as a restaurant while still equipped for sailing); *The Ark,* 17 F.2d 446 (D.Fla.1926) (houseboat lacking motive power, but not permanently attached to the shore). *See* cases cited in 2 M. Norris, *supra,* § 669 at 303–05. On the facts before it, the district court erred in concluding as a matter of law, that the barge upon which Griffith was injured was not a "vessel in navigation." Were this the sole ground upon which to determine seaman status we would be required to reverse on the basis of the evidence adduced below. However, as stated earlier, we agree with the district court that Griffith's argument for his status as a seaman fails for proof of his permanent connection with the vessel or that he was aboard primarily to aid in its navigation.

■■■ There must be a more or less permanent connection or attachment between the vessel and the worker as opposed to a temporary relationship. *Senko v. La Crosse Dredging Corp.,* 352 U.S. 370, 372, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957); *Norton v. Warner Co.,* 321 U.S. 565, 573, 64 S.Ct. 747, 88 L.Ed. 931 (1944); *Bullis v. Twentieth Century-Fox Film Corp.,* 474 F.2d 392, 394 (9th Cir. 1973). A worker whose duties require him to load barges on an irregular or temporary basis is not a seaman. *Thibodeaux v. J. Ray McDermott Co.,* 276 F.2d 42 (5th Cir. 1960). Here, the record evidence indicated that Griffith was assigned on a temporary daily basis to work with the regular river landing crews, and that his contact with the barges had been infrequent, amounting to only 3¾ days of the 74 days he had been employed by Wheeling. This temporary relationship, cannot as a matter of law, give rise to seaman status.

■■■ The evidence also indicates that Griffith was not aboard the barge primarily to aid in its navigation. The sole reference to such a function in the record is that Griffith assisted in the throwing of lines from one barge to the other when the barges were being "rounded" between loading operations. At all other times, Griffith was involved in the loading of cargo. A worker upon a barge whose primary duties involve the handling of cargo rather than the carrying out of required navigational responsibilities is a longshoreman rather than a seaman. *South Chicago Coal & Dock Co. v. Bassett,* 309 U.S. 251, 60

S.Ct. 544, 84 L.Ed. 732 (1940). Griffith contends that this circuit's decision in *Mack v. Pennsylvania R. R. Co.,* 317 F.2d 761 (3d Cir. 1963), supports his status as a seaman. However the bargeman in *Mack* was *permanently* assigned to work at the river landing where he performed a *substantial* amount of his work time on the barges, which duties involved *significant* navigational functions, and who was injured while *moving* a loaded barge, 317 F.2d at 762–63. Griffith was not permanently assigned to the river crew, performed insignificant navigational functions, and was not injured while performing such a function. The facts in *Mack* are therefore inapposite to Griffith's situation, and its holding is supportive of the finding below. The district court properly concluded that Griffith was not, as a matter of law, a "seaman" for Jones Act purposes. Therefore, we next consider Griffith's claims brought as a longshoreman.

## IV. THE 1972 AMENDMENTS.

When Congress, in 1927, enacted the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.,* ch. 509, § 1, 44 Stat. 1424, it provided that an employer's liability for compensation was to be "exclusive and in place of all other liability" to an injured longshoreman.[2] 33 U.S.C. § 905. Following the model of typical provisions in state workmen's compensation laws,[3] it also provided that if some person other than the employer or a person in his employ was liable in damages for the longshoremen's injury, he could recover against "such third person." 33 U.S.C. § 933(a). There was as well the typical compensation lien on the third party recovery. 33 U.S.C. § 933(b). In *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Supreme Court held that a longshoreman could recover from a shipowner, not his employer, in a third party action, under the refurbished doctrine of unseaworthiness.[4] In *Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court held that the shipowner could recover full indemnity for any amount paid on the *Sieracki* claim because of an implied warranty of workmanlike service running from the stevedore employer to the shipowner. This was so, some courts held, even when the breach of warranty was the result of the injured longshoreman's own carelessness.[5]

---

**2.** Section 5, 33 U.S.C. § 905 provided:

"The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under this chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, nor that the employee assumed the risk of his employment, nor that the injury was due to the contributory negligence of the employee."

Pursuant to the 1972 amendments, this section was designated as subsection (a), remaining otherwise unchanged. 33 U.S.C. § 905, *as amended,* 33 U.S.C. § 905(a).

**3.** 3 Larson Workmen's Compensation § 89.10 (1952).

**4.** Although the Supreme Court had as far back as 1903, recognized a right to recover damages for injuries caused by unseaworthiness of the ship in *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), the remedy had, until the mid-1940's, remained obscure and relatively little used. See G. Gilmore & C. Black, The Law of Admiralty § 6–38, at 383 (2d ed. 1975). Thereafter, the remedy experienced a rapid judicial development into a doctrine recognizing an absolute duty to provide a safe place to work. In addition to *Sieracki, supra, see Mahnich v. Southern S. S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

**5.** *McLaughlin v. Trelleborgs Angfartygs A/B,* 408 F.2d 1334 (2d Cir.), *cert. denied,* 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 464 (1969).

The practical effect of the *Sieracki-Ryan* circle was to eliminate from § 5 of the 1927 Act, 33 U.S.C. § 905, the "exclusive and in place of all other liability" provision, and to make employers of longshoremen liable not only for compensation but also for the open-ended and faultless liability for unseaworthiness. And, by an interpretation of the Extension of Admiralty Act of 1948, 46 U.S.C. § 740, in *Gutierrez v. Waterman S. S. Corp.*, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1962), the Court managed to extend *Sieracki-Ryan* liability shoreward to the pier, at least when the ship's tackle or equipment in some way contributed to the unsafe condition on the pier.[6]

The insurance carriers for the stevedoring companies, disturbed by the Court's dismantling of § 5, appealed to Congress. After some hard lobbying by competing interests, Congress, in enacting the 1972 amendments, substantially raised the workmen's compensation benefits payable under the Act to an injured longshoreman, and as a trade-off to the stevedoring employers, overruled the *Sieracki-Ryan* liability. The provisions of the 1972 amendments relevant to the case *sub judice* which we first consider are those contained in §§ 2(a), 2(b) & 18(b), 33 U.S.C. §§ 902(3), (4) & (21), which set forth the definitions respectively of the terms "employee," "employer," and "vessel."

An "employee" is "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations . . . but . . . not . . . a master or member of a crew of any vessel . . . ." § 2(a), 33 U.S.C. § 902(3).[7]

An "employer" is one "whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining . . . area customarily used . . . in loading . . . a vessel). . . ." § 2(b), 33 U.S.C. § 902(4).[8] Thus if Griffith was not a member of a crew of a vessel,[9] he was an "employee" and Wheeling was an "employer" within the meaning of the Act.

A "vessel" means "any vessel upon which or in connection with which" a covered employee "suffers injury or death . . . and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer or crew member." § 18(b), 33 U.S.C. § 902(21).[10] For present purposes the key words are "vessel owner" and "owner pro hac vice." American concedes that it is a "vessel owner." Wheeling concedes that it might be

---

**6.** *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), which distinguished *Gutierrez*, but did not overrule it, established the outside limit of the extension of *Sieracki-Ryan* liability shoreward.

**7.** § 2(a), 33 U.S.C. § 902(3) provides in full:
"The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."

**8.** § 2(b), 33 U.S.C. § 902(4) provides in full:
"The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part,

upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)."

**9.** See section III, *supra*, for a discussion of the "crew" contention.

**10.** Section 18(b), 33 U.S.C. § 902(21) provides in full:
"The term 'vessel' means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member."

found to be an "owner pro hac vice" as that term has been applied in this circuit.[11]

▮ The other 1972 amendment to which we direct our attention, § 18(a), 33 U.S.C. § 905(a), repeats the exclusive remedy provision of § 5 of the 1927 Act, 33 U.S.C. § 905. The amendment then adds a new subsection "(b)" which is intended to have the effect of overruling *Sieracki-Ryan* liability:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided by this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter." Section 18(a), 33 U.S.C. § 905(b).

The effect of the second clause of the first sentence of § 905(b) is to eliminate the vessel's *Ryan* action against the stevedore. The effect of the next from last sentence is to eliminate the longshoreman's *Sieracki* third party action for unseaworthiness against the vessel. The effect of the first clause of § 905(b) is to create in their place, a new negligence third party cause of action against the vessel,[12] and the effect of the last sentence is to make that cause of action the exclusive remedy of a longshoreman against a vessel. The second sentence relieves the vessel from liability for negligence caused by persons engaged in providing stevedoring services, thus preventing the imposition of liability on the vessel on some respondeat superior or absolute duty of care basis.

One would like to assume that the ghost of *Sieracki-Ryan* has been exorcised completely by the addition of § 905(b), and that the exclusive remedy provision of § 905(a) has been restored to the pristine vigor intended by Congress in 1927. But what of the situation where someone is both an "employer" and a "vessel"? The reference to "vessel" in § 905(b) is to "vessel" as defined in the 1972 amendment quoted earlier; that is, not only the vessel itself, but also its "owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." § 18(b), 33 U.S.C. § 902(21). If any of these *also* employ longshoremen, may they be liable both for compensation benefits and for negligence? We can set to one side crew members engaged in loading or unloading since by definition they are not "employees," and thus are

11. *See, e. g., Blair v. United States Steel Corp.*, 444 F.2d 1390 (3d Cir. 1971) (per curiam), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 481, 30 L.Ed.2d 666 (1972); *Aird v. Weyerhaeuser S. S. Co.*, 169 F.2d 606, 609–10 (3d Cir. 1948). *See generally* G. Gilmore & C. Black, The Law of Admiralty §§ 4–20 to 4–24, at 239–43 (2d ed. 1975).

12. Although § 905(b) created a new negligence remedy, Congress' failure to expressly define the standard of care to be applied under it has led some commentators to conclude that it should be treated as if it were a Jones Act action. 46 U.S.C. § 688. *See* section VIII, *infra.* The district court below attempted to equate the standard of care under these two statutory remedies. *See* section V, *infra.* However, because Congress appears to have directed the application of a uniform, national, land-based standard under § 905(b), *see* notes 21 & 22, *infra*, reference to the Jones Act practice is unconvincing. In view of the posture in which this case came before us, we do not today decide what that standard ought to be except to suggest the need for careful analysis in light of what Congress has proposed. *See* note 24, *infra*, and accompanying text.

not covered by the Act. § 2(a), 33 U.S.C. § 902(3). But what of the owner who employs longshoremen who are not crew members?

## V. THE DISTRICT COURT'S ANALYSIS.

■■■ The district court correctly recognized, and American does not contest on appeal, that Griffith has a third party negligence action against it as owner of barge No. 2730. The court also properly held that because Wheeling had exclusive control and possession of the barge at the time of the injury it was under our cases a vessel owner *pro hac vice*. But it refused to draw the conclusion that because a *pro hac vice* owner was by definition a "vessel," Wheeling was a "vessel" within the meaning of § 905(b) for purposes of negligence liability. Instead the court concluded:

"The fact that such previously permissible actions against a party such as Wheeling-Pittsburgh are no longer permissible, can be taken to mean that Congress did not intend to permit a cause of action against an owner *pro hac vice* after the effective date of the 1972 amendments to the LSHWCA."[13]

This reasoning disregards the plain language of the statute. Congress clearly did contemplate actions against owners *pro hac vice*. The definition of "vessel" in the amended codification, § 18(b), 33 U.S.C. § 902(21), appears immediately following § 18(a) which sets forth the new negligence remedy in 33 U.S.C. § 905(b).[14] The "vessel" made liable for negligence in § 18(a) is the "vessel" as defined in § 18(b). No construction can be placed on the statute which would differentiate an owner *pro hac vice* from an owner, a charterer, an agent, or a master.

A second reason relied on by the district court for rejecting the negligence claim against Wheeling was that to do so

would in effect "allow him to pursue the Jones Act negligence remedy which is clearly unavailable to him since he has been found not to be a 'seaman'."[15] This reason will not stand scrutiny either, since there is no indication that Congress sought to equate the standard of care due a seaman under the Jones Act with that due a longshoreman under § 905(b). In fact, as will be discussed in Section VIII of this opinion, *infra*, it appears that it was Congress' intent to have the courts apply a uniform, national, land-based standard rather than the more burdensome standard under the Jones Act which permits "even the slightest" negligence to sustain a recovery. *Ferguson v. Moore-McCormack Lines, Inc.*, 352 U.S. 521, 77 S.Ct. 459, 1 L.Ed.2d 515 (1957). To attempt to equate these two very different statutory remedies as a basis for denying Wheeling's potential liability is unconvincing.

Thus we cannot affirm the summary judgment for Wheeling against Griffith on any of the grounds relied on by the district court.

## VI. ALTERNATIVE CONSTRUCTIONS.

■■■ One clause of § 905(b) which might potentially insulate Wheeling from liability is the language "no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel." The members of the barge crew who fastened the cables to the hatch covers, and the crane operator who applied tension to the cable which opened the hatch through which Griffith fell, clearly were providing such stevedoring services, and none of their negligence can be the basis for imposing liability on an owner *pro hac vice*. But on the present record, there is evidence that Joseph Allfree, Wheeling's crew fore-

13. 384 F.Supp. at 237.

14. 1 U.S.Code Cong. & Admin.News, pp. 1467–68 (1972).

15. 384 F.Supp. at 237 (footnote omitted). See Section III, *supra*, for discussion of Griffith's "seaman" status.

man, observed the defective condition of the hatch covers and departed, apparently without giving any warning of a potentially hazardous condition. There is no conclusive evidence that he made these observations in the capacity of stevedore or as agent of Wheeling as owner *pro hac vice*. At a trial, testimony might so conclusively establish Allfree's stevedore status that Griffith could not get to the jury, or instead might establish that his conduct was not negligent. But on the present record we could not, especially at the appellate level, grant summary judgment for Wheeling on either ground.

The final, and most compelling construction which would insulate Wheeling from liability for negligence, is to concentrate not on § 905(b), but on § 905(a), the exclusive remedy provision, which has been a part of the statute since 1927. The language in § 905(a) could hardly be plainer:

> "The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of *all other* liability of such employer to the employee . . . ." (emphasis supplied).

There is no exception in § 905(a) for § 905(b) liability of an "employer" who is also a "vessel." [16] If the claimant is an "employee" as defined in § 2(a)(3), that is, if he is a person engaged in maritime employment who is not "a master or member of a crew of any vessel," 33 U.S.C. § 902(3), then he has no remedy against his employer even when the employer also is the "vessel." If Griffith was not a member of the crew of barge No. 2730 he was an employee, and the exclusive remedy provision bars any remedy other than workmen's compensation.[17]

This construction would leave longshoremen covered by the Act with third party actions against anyone who may be liable, under federal or state law, ex-cept an "employer" who is liable only for compensation. Such a construction would be consistent with the language of 33 U.S.C. § 933(a), the "third party" section, which provides in part:

> "If . . . the person entitled to such compensation determines that some person *other than the employer* . . . is liable in damages, he need not elect whether to receive such compensation or to recover damages against such third person." (emphasis supplied).

It would place longshoremen in the same position with respect to seaward third parties as to shoreside third parties. If a truck owned and operated by an outside contractor should injure the longshoreman on the pier he would have a third party action, while if the truck was owned and operated by his employer, he would not. The heart of all workmen's compensation systems is the trade-off between the certainty of benefits and the limitation of employer liability. There is no argument in logic and reason why an employer who owns barges should be treated less favorably than an employer who owns trucks.

But while logic and common sense suggest the literal application of § 905(a), the ghost of *Sieracki-Ryan* stands in the way. The Supreme Court has already construed the exclusive remedy provision as permitting a suit against a *pro hac vice* owner who was also an employer. In *Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), a longshoreman was injured as a result of an unseaworthy condition on board the vessel The Yaka, which was under bareboat charter to Pan-Atlantic Steamship Corporation, his employer. Reed brought an in rem action against the vessel. He was not a member of the crew, and thus was covered under LHWCA. Reviewing the way in which *Sieracki* and *Ryan* had already made an end-run around the exclusive remedy

---

**16.** The only exception in § 905(a) is the liability of an employer who fails to secure payment of compensation as required by the Act.

**17.** This view has the support of at least some of the treatise writers. *See, e. g.,* G. Gilmore & C. Black, The Law of Admiralty § 6–57, at 450 (2d ed. 1975).

provision in § 905(a) (then § 905), Justice Black, writing for the Court, concluded:

"In the light of this whole body of law, statutory and decisional, only blind adherence to the superficial meaning of a statute could prompt us to ignore the fact that Pan-Atlantic was not only an employer of long- shoremen but was also a bareboat charterer and operator of a ship and, as such, was charged with the tradi- tional, absolute, and nondelegable obli- gation of seaworthiness which it should not be permitted to avoid. . . ." 373 U.S. at 415, 83 S.Ct. at 1353.

Thus § 905, now § 905(a), was held to be no bar to a suit against a vessel char- tered to a *pro hac vice* owner which was also an employer liable for compensation payments. As the treatise writers have observed:

"After *Reed v. The Yaka* the long- shoreman's action might just as well have been brought directly against his employer—which would have simpli-

fied the situation procedurally. How- ever, in the customary employment sit- uation, the parties, out of politeness or inertia, continued to observe the elabo- rate formalities of the *Sieracki-Ryan* ritual: longshoreman sued ship or shipowner, who impleaded employer in his third party indemnity action . . . . . ."

G. Gilmore & C. Black, The Law of Admiralty § 6–55, at 445 (2d ed. 1975) (footnote omitted).

Since Congress made no change in the operative language of the exclusive rem- edy provision, we would appear to be bound by the eviscerating construction of *Reed v. The Yaka, supra.* Congress was aware of that construction, and de- liberately chose to deal with it only to the limited extent of the second sentence in § 905(b).[18] The vessel, even a vessel which is an employer under the Act, is relieved of liability for negligence of persons engaged in providing stevedor- ing services, but is not relieved of liabili- ty for its own "owner" occasioned negli- gence.[19] See 1A Benedict on Admiralty

**18.** The House Report states:

"The Committee has also recognized the need for special provisions to deal with a case where a longshoreman or ship builder or repairman is employed directly by the vessel. In such case, notwithstanding the fact that the vessel is the employer, the Su- preme Court in *Reed v. S. S. Yaka*, 373 U.S. 410 [83 S.Ct. 1349, 10 L.Ed.2d 448] (1963) and *Jackson v. Lykes Bros. Steamship Co.*, 386 U.S. 731 [87 S.Ct. 1419, 18 L.Ed.2d 488] (1967), held that the unseaworthiness reme- dy is available to the injured employee. The Committee believes that the rights of an in- jured longshoreman or ship builder or re- pairman should not depend on whether he was employed directly by the vessel or by an independent contractor. Accordingly, the bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons en- gaged in performing longshoring services. Similar provisions are applicable to ship building or repair employees employed di- rectly by the vessel. The Committee's intent is that the same principles should apply in determining liability of the vessel which em- ploys its own longshoremen or ship builders or repairmen as apply when an independent

contractor employs such persons." 3 U.S. Code Cong. & Admin.News, p. 4705 (1972) (footnotes omitted).

**19.** The House Report states:

"Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's re- sponsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.

So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Sec- tion 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the *vessel* put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign sub- stance had been on the deck for such a peri- od of time that it should have been discover- ed and removed by the *vessel* in the exercise of reasonable care by the *vessel* under the circumstances. *The vessel will not be chargeable with the negligence of the steve-*

§ 27, at 2–24; § 115, at 6–16 (7th ed. 1973).

Thus, no construction appears open which would shield Wheeling from liability as a *pro hac vice* owner for the negligence of employees engaged in services in connection with the barge other than stevedoring. Since on this record, as we indicated earlier, questions of material fact exist concerning the status of employees who observed the condition of the hatch covers, or exist as to their own negligence as barge crewmen, rendering services other than stevedoring services, the district court's granting of summary judgment in Wheeling's favor against Griffith must be reversed.

## VII. AMERICAN'S CROSS–CLAIM.

The district court correctly held that American had no right of indemnification, express or implied, against Wheeling as a stevedore employer, because, as we pointed out above, the second clause of the first sentence in § 905(b) eliminated the *Ryan* remedy. But American also asserts a claim for contribution.

 If it should be determined that Wheeling's only negligence is that of employees performing stevedoring duties, there will be no joint tortfeasor liability. *Halcyon Lines v. Haenn Ship Corp.*, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952); *Atlantic Coast Lines R. Co. v. Erie Lackawanna R. Co.*, 406 U.S. 340, 92 S.Ct. 1550, 32 L.Ed.2d 110 (1972).[20] We have held, however, that Wheeling may be held liable for negligence as a *pro hac vice* owner for non-stevedoring, "owner" negligence. If

dore or employees of the stevedore."
3 U.S.Code Cong. & Admin.News, p. 4704 (1972) (emphasis supplied).

**20.** *See generally* Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 45 Cal.L.Rev. 304 (1957).

**21.** The House Report states:
"Under this standard, as adopted by the Committee, there will, of course, be disputes as to whether the vessel was negligent in a particular case. Such issues can only be

both Wheeling, as *pro hac vice* owner, and American, as vessel owner, are found to be negligent, joint tortfeasor contribution between them in this non-collision maritime case is available. *Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 113, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). In *Cooper Stevedoring*, the Court did not determine whether contribution should be determined in accordance with the comparative degree of fault of the parties. 417 U.S. at 108 n. 3, 94 S.Ct. 2174. However, more recently, the Court in a maritime collision case, reversed the long line of authorities providing for equal contribution in favor of a comparative negligence rule of contribution. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). We see no reason why the *Reliable Transfer* rule should not apply in noncollision, as well as in collision maritime cases.

Since Wheeling's potential liability as a *pro hac vice* owner raises the possibility of a claim by American for contribution under *Cooper Stevedoring* and *Reliable Transfer*, the order granting summary judgment in Wheeling's favor against American must also be reversed.

## VIII. THE STANDARD OF CARE.

 American would have us suggest to the district court the appropriate standard of care a vessel owes a longshoreman under the negligence remedy created by § 905(b). While neither that provision, nor the balance of the 1972 amendments address the issue, the House Report suggests the intention to apply land-based common law negligence principles on a uniform national basis.[21]

resolved through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties. The Committee intends that on the one hand an employee injured on board a vessel shall be in no less favorable position vis a vis his rights against the vessel as a third party than is an employee who is injured on land, and on the other hand, that the vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such

American suggests that the court should look to the landowner liability as defined in the *Restatement (Second) of Torts* § 343A (1965) for an appropriate analogue. Some district courts have already adopted such a standard.[22] That approach would foreclose use of the higher standard of care developed under the Jones Act,[23] which permits recovery for "even the slightest" negligence. *E. g., Ferguson v. Moore-McCormack Lines, Inc.*, 352 U.S. 521, 77 S.Ct. 459, 1 L.Ed.2d 515 (1957). A leading treatise, on the other hand, urges:

> "If the courts fashion the § 905(b) action in the image of the Jones Act action, they will find helpful precedents for most of the problems that will arise in litigation. If they do so, the LHCA harbor workers will be substantially in the position of the Jones Act seaman (with compensation benefits substituted for maintenance and cure) except that the harbor workers will not be entitled to recover under the no fault fringes of the unseaworthiness doctrine. If the courts do not do that, the § 905(b) U.S.C.A. annotations will in time rival the Jones Act annotations." G. Gilmore & C. Black, The Law of Admiralty § 6–57, at 455 (2d ed. 1975).

We cannot in this case do more than suggest that there is a problem.[24] The

district court did not decide any standard of care issue, and none is before us in a context sufficiently concrete and adversary for our decision at this time.

## IX. CONCLUSION.

The summary judgment in favor of Wheeling and against Griffith and American will be reversed and the cause remanded for further proceedings consistent with this opinion.

---

as would render a land-based third party in non-maritime pursuits liable under similar circumstances.

. . . . .

Finally, the Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law. In that connection, the Committee intends that the admiralty concept of comparative negligence, rather than the common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of 'assumption of risk' in an action by an injured employee shall also be applicable."
3 U.S.Code Cong. & Admin.News, pp. 4704, 4705 (1972).

**22.** *See Ramirez v. Toko Kaiun K. K.*, 385 F.Supp. 644 (N.D.Cal.1974); *Birrer v. Flota Mercante Grancolombiana*, 386 F.Supp. 1105 (D.Or.1974); *Citizen v. M/V Triton*, 384 F.Supp. 198 (E.D.Tex.1974); *Fedison v. The Vessel Wislica*, 382 F.Supp. 4 (E.D.La.1974); *cf. Streatch v. Associated Container Transp., Ltd.*, 388 F.Supp. 935 (C.D.Cal.1975).

**23.** 46 U.S.C. § 688.

**24.** The other leading treatise comes to the opposite conclusion. "It is evident that Congress has not adopted the standard of the shipowner's liability under the Jones Act . . . ." 1A Benedict on Admiralty § 112, at 6–10 (7th ed. 1973). *See* the discussion in *Lucas v. "Brinknes" Schiffahrts Ges.*, 379 F.Supp. 759, 767–68 (E.D.Pa.1974), *appeal dismissed*, No. 75–1223 (3d Cir., April 30, 1975), *pet. for cert. filed*, 44 U.S.L.W. 3054 (U.S., July 14, 1975). *See* note 12, *supra*.