**Mario LUBRANO, Plaintiff,**

v.

**ROYAL NETHERLANDS STEAMSHIP COMPANY, Defendant.**

**No. 75 Civ. 1474–CSH.**

United States District Court, S. D. New York.

March 31, 1977.

Zimmerman & Zimmerman, New York City, for plaintiff; Howard Fishkin, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendant; William M. Kimball, New York City, of counsel.

1. Plaintiff was injured on December 27, 1972. Accordingly the 1972 amendments to LAHWCA, which became effective thirty days

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

Defendant moved, at the end of plaintiff's case, for a directed verdict in its favor pursuant to Rule 50(a), F.R.Civ.P. For the reasons stated below, the motion is granted and the complaint dismissed.

### I.

Plaintiff Mario Lubrano commenced this action for personal injuries against defendant Royal Netherlands Steamship Company pursuant to the Longshoremen's and Harbor Workers' Compensation Act (LAHWCA), 33 U.S.C. § 901 et seq.[1]

The case was called for trial before a jury on March 30, 1977. At the Court's direction the trial was bifurcated, the issue of liability being tried first, and questions of damages being held in abeyance.

Plaintiff called two witnesses on the issue of liability; himself, and Willie Joe Ashley, the stevedoring hatch boss under whose direct supervision plaintiff was working when he suffered his injury. The evidence of these two witnesses may now be summarized.

On the morning of December 27, 1972, plaintiff Lubrano reported for work on board defendant's cargo vessel CHIRON, then lying at Pier 39, Brooklyn. Plaintiff was employed by Northeast Stevedoring Company, with whom the defendant shipowner had contracted to perform stevedoring services on board its vessels.

Plaintiff was a "holdman", a designation reflecting the fact that he performed his labors in the holds of vessels, rather than working on deck. During the morning in question, plaintiff and his particular gang of longshoremen, consisting of seven other men, were assigned to work in the number 1 lower hold of the CHIRON.

Plaintiff's immediate superior was his hatch boss, Willie Joe Ashley. Ashley di-

after the date of their enactment on October 27, 1972, govern the case.

rected a group of 18 longshoremen, who were assigned to work at the vessel's number 1 hatch. Ashley's immediate superior was a stevedore foreman named Pete Spano, who, as in the case of plaintiff and Ashley, was an employee of Northeast. Spano's responsibility was to supervise the activities of the Northeast longshoremen throughout the vessel.

After clearing away the number 1 hatch, plaintiff and his seven fellow longshoremen descended into the number 1 lower hold, arriving there at about 8:15 in the morning. It was intended to load a cargo of drums of tallow in the lower hold. In order to prepare the hold for the cargo, the longshoremen laid down a wooden flooring, the wood being supplied by the vessel.

After this flooring was laid down, the drums of tallow were raised from the pier and lowered into the hold, by means of the vessel's winches. These metal drums stood about 3½ feet high, and contained about 55 gallons of tallow.

Tallow is a greasy, highly slippery substance. The exterior of the drums being loaded into the CHIRON were covered with tallow, and in consequence the drums were themselves slippery.

The drums were lowered into the lower hold in drafts of 6 drums each. When such a draft reached the bottom of the hold, two longshoremen would roll each drum into a wing of the hold, and then stand the drum on end. Eventually a tier of drums, covering the entire floor of the hold and filling the wings and the square of the hatch, had been arranged, the drums standing on end and next to each other.

In the course of handling these drums, the longshoremen's gloves became saturated with greasy tallow, and their shoes became covered with the substance.

It was also intended to stow a second tier of drums upon the first tier. Before doing so, it was necessary to lay a floor of dunnage upon the top of the first tier of drums. "Dunnage" consists of pieces of rough lumber or plywood. Its purpose, in the circumstances of the case at bar, was twofold: to separate the tiers of drums and so prevent the contact of "metal on metal"; and to serve as a layer upon which the longshoremen could stand, walk and work as they put the second tier into place. This latter function served as a safety factor for them, since, as noted *supra*, the tops of the drums were slippery with tallow, and so, after they had been working in the hold for awhile, were the soles of the longshoremen's shoes.

When the first tier of drums was in position, the longshoremen requested dunnage to be used for these purposes. Some dunnage was forthcoming, supplied by the vessel. However, as the work progressed, it became apparent that there was insufficient dunnage to construct a layer which would completely cover the top of the first tier of drums.

The longshoremen working in the hold, including plaintiff, immediately called this situation to the attention of Ashley, the hatch boss, who was standing on deck next to the hatch. The longshoremen shouted to Ashley that they needed more dunnage. Ashley made this need known to Spano, the stevedoring foreman, and together these two men called the necessity for more dunnage to the attention of one of the vessel's officers.

This officer advised Spano and Ashley, in substance, that those in charge of the vessel were aware of the need for more dunnage; that more dunnage had in fact been sent for; and that the longshoremen should hold off on working in the hold until the additional dunnage arrived. It was apparent from Ashley's testimony that no source of additional dunnage was immediately available to the steamship company on the pier, and that the additional dunnage would have to be brought from a lumber yard.

Notwithstanding this advice from the vessel's officer (that additional dunnage had been ordered and was on the way), coupled with his sensible suggestion (that the longshoremen wait until the dunnage had arrived before completing the second tier of drums) Spano, the stevedoring foreman, undertook to instruct Ashley that the

gang in the number 1 lower hold would not be kept idle until the dunnage arrived; that they were instead to continue with their labors; and that they would just have to "do the best you can." Ashley relayed those instructions to plaintiff and his colleagues in the lower hold, and, in obedience to those instructions, the stowing of the second tier of drums continued, in the face of the hazard previously described.

Unfortunately, as he was placing the final drum in the second tier into position, plaintiff Lubrano slipped on the greasy undunnage metal surface of the first tier of drums. The drum then also slipped and fell against Lubrano, causing the injuries for which he brought suit.

The accident occurred at about 10:00 a. m. Sometime thereafter, the additional dunnage which the vessel owner had ordered arrived.

## II.

The effects of the 1972 amendments to the LAHWCA were to create a cause of action sounding in negligence on behalf of longshoremen against the vessels upon which they work and the vessel owners, and also to make that cause of action the exclusive remedy of longshoremen against vessels or ship owners. *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31, 40 (3rd Cir. 1975), *cert. den.*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643. With this legislative scuttling of the doctrine of unseaworthiness as a basis of liability, the Congress "suggested land-based principles of negligence as the standard of care for vessels boarded by dock workers." *Napoli v. Transpacific Carriers Corp., et al.*, 536 F.2d 505, 507 (2d Cir. 1976).

The case at bar presents a situation of obvious danger, fully observed and ap-

preciated by the plaintiff and his fellow longshoremen. That danger arose from the slippery grease which covered the drums of tallow being loaded and stowed in the vessel. Precisely because plaintiff observed and appreciated the resulting danger, he joined with his fellow longshoremen in urgent requests that additional dunnage be supplied, so that the first tier of drums could be entirely covered by dunnage, rather than leaving certain areas exposed, with resultant risk that the longshoremen's feet might slip upon them.

Earlier authorities gave rise to "the traditional rule of land-based negligence which is in substance that there is no obligation to warn an invitee of dangers which are known to him or which are so obvious that he may reasonably be expected to discover them himself." *Napoli, supra* at 536 F.2d p. 508. It was a corollary of that rule that an individual who continues in his activities, in disregard of such a danger, could not hold a landowner liable for injuries which were suffered in consequence. That traditional rule of negligence inspired the district court's charge to the jury in *Napoli* which formed the basis of the successful appeal in that case.[2]

The Second Circuit reversed a jury verdict in favor of the defendant shipowner, and remanded the case for a new trial, because it considered that the charge quoted in the margin constituted error. Criticizing the district judge's charge in *Napoli,* the Second Circuit stated:

"... a charge which relieves a shipowner of liability for a dangerous condition which was 'known to the stevedore or to any of its employees' is clearly inappropriate where the shipowner, itself, is the stevedore. Moreover, we do not think that instructions which flatly negate the duty to protect against obvious

---

**2.** The district judge in *Napoli* charged the jury as follows:

"Now, if you find that the condition complained of by the plaintiff, that is permitting snow to accumulate under the plywood which caused the plywood to slip out from under him was known to the stevedore or to any of its employees, including the plaintiff,

or if this condition was so open and obvious that it should have been observed, then the ship owner owes no responsibility to warn a longshoreman of the open condition. If you find such then you can not find that the defendant was negligent and you must return a verdict for the defendant." 536 F.2d at p. 507–8.

danger properly portray the present-day obligations owed by a landowner to one whom he invites upon his premises." 536 F.2d at p. 508.

Since, in the case at bar, the defendant shipowner arranged with an independent contractor, Northeast, for the furnishing of stevedoring services, the first basis of criticism in *Napoli,* namely that "the shipowner, itself, is the stevedore", is not present. Accordingly the question presented by defendant's motion for directed verdict is whether those "present-day obligations", falling upon a landowner and, by logical extension, upon a shipowner, to protect against obvious danger, as enunciated in *Napoli,* operate on the facts of the present case to entitle plaintiff to a recovery which, under the traditional rules of negligence, would be denied him.

Before viewing the facts of the case at bar in this context, it is instructive to consider the facts presented in *Napoli,* as revealed by the opinion of the Court of Appeals. There are significant differences.

One difference has already been noted. In *Napoli* the shipowner itself acted as its own stevedore. That is not the situation in the case at bar.

Secondly, the injury in *Napoli* occurred not as the result of an insufficiency of equipment which manifested itself as the work on board the vessel progressed; rather, the injury resulted from a condition (snow both on top of and beneath plywood boards resting on top of a deck load of drums), which apparently existed when the longshoremen commenced their work and continued throughout the performance of their labors, until the injury occurred.

Third, there is no evidence whatsoever in *Napoli* that the shipowner or its employees undertook to correct the dangerous condition, suggesting to the longshoremen that the work be held off until the condition had been corrected. But that is precisely, on the present plaintiff's own evidence, what happened in the case at bar.

In essence, *Napoli* suggests potential grounds of liability on the part of a shipowner upon which an injured longshoreman may rely, even though he proceeded in the face of an obvious danger. The question presented on the motion for directed verdict is whether the plaintiff proved any facts which would permit the jury to invoke the potential bases of liability which arise out of *Napoli.* That is the question which I answer in the negative.

The rationale of *Napoli* is based upon Section 343A of the Restatement of Torts 2d, which reads in pertinent part:

"A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness."*

The emphasis which I have given to the last phrase of this Section was also given by the Second Circuit in *Napoli.* Applying the principle set forth in Section 343A to cases where longshoremen suffer injuries on vessels, the Second Circuit said:

"In the present case, there was evidence from which a jury might conclude that the ship should reasonably have anticipated that Napoli would not be able to avoid the danger despite its obviousness. The thrust of Napoli's testimony was that he had to stand on the plywood in order to carry out his duties of giving signals to the winchmen. Thus, it might be argued that if this was the only place for Napoli to work and carry out his job, the vessel might reasonably anticipate that he would use it despite its obvious danger, *since the only alternatives would be to leave his job or face trouble for delaying the work.* Should the jury be persuaded by this argument *and find that the shipowner was negligent in not correcting the open and obvious danger* but that the plaintiff was contributorily negligent, it would apply the doctrine of comparative negligence to reduce the shipowner's liability proportionately." 536 F.2d at p. 509. (emphasis added).

The Second Circuit concluded its opinion with a reinvocation of the Restatement:

"Accordingly, we believe that where a shipowner has notice of an obviously dangerous condition, his duty of care to longshoremen exposed to such danger should be as set forth in § 343A of the Restatement of Torts above quoted." 536 F.2d at p. 509.

In *Napoli,* the Second Circuit immediately preceded the discussion which I have just quoted with this paragraph:

"Applying such an 'obvious danger' standard does not run contrary to the intent of Congress, in passing the 1972 amendments, that principles of negligence rather than of strict liability should govern the vessel's liability. Under this rule, a vessel is liable to longshoremen only for injuries resulting from obvious dangers *which it should reasonably anticipate that the longshoremen would be unable to avoid.*" 536 F.2d at p. 509. (emphasis added).

It is apparent from the discussion in *Napoli* that Section 343A of the Restatement underlies the Court's rationale. Accordingly it is instructive to consider the comments of the Restatement's draftsmen. Comment *f* to the Section in questions reads:

"There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of *reasonable care* which he owes to the invitee for his protection. This duty may require him to warn the invitee, or *to take other reasonable steps to protect him,* against the known or obvious condition or activity, if the possessor has *reason to expect that the invitee will nevertheless suffer physical harm.*

"Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, where the possessor has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to

protect himself against it. Such reason may also arise where the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because *to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.* In such cases the fact that the danger is known, or is obvious, is important in determining whether the invitee is to be charged with contributory negligence, or assumption of risk. (See §§ 466 and 496D.) It is not, however, conclusive in determining the duty of the possessor, or whether he has acted reasonably under the circumstances." (emphasis added).

The evidence in the case at bar precludes application of the *Napoli* bases of shipowner's liability, grounded as they are in the principles of Section 343A of the Restatement. In *Napoli,* there was a total failure on the part of the shipowner to attempt to correct the known hazardous condition. In the case at bar, the shipowner undertook to obtain additional dunnage when, during the progress of the work, its necessity became apparent. There was no evidence adduced by the plaintiff from which the jury could have found that the shipowner's efforts were unreasonable.

Secondly, the case at bar does not present the situation of a longshoreman unable, in the particular circumstances confronting him, to do anything other than continue to work in the face of a known danger. As I understand *Napoli,* the pressures arising out of such a "Hobson's choice" lie at the heart of the Court's rationale. In the case at bar, on plaintiff's own evidence, it was suggested by the vessel's officer to the stevedoring supervisors that the work be held off until the additional dunnage arrived. There is no evidence whatsoever that those in charge of the vessel were pressuring the longshoremen to continue work without interruption, so that, for example, the vessel might sail with the tide or in accordance with a prearranged schedule. The decision to continue work, in the face of a known hazard, and despite the knowl-

edge that the requested additional dunnage was on the way, was made by the stevedoring supervisors; and that decision was neither requested nor participated in by the defendant or its officers.

Finally, it cannot be said that the defendant could reasonably have anticipated such action on the part of the contracting stevedore which it had retained. Because that is so, no foundation was laid in the evidence for application of that final phrase in Section 343A of the Restatement, upon which the Second Circuit laid such emphasis in *Napoli,* namely, that "the possessor should anticipate the harm despite such knowledge or obviousness."

A further source of instruction appears in the illustrations which the authors of the Restatement chose in respect of the basis of liability under discussion. Illustration 5 involves a slippery surface:

> "A owns an office building, in which he rents an office for business purposes to B. The only approach to the office is over a slippery waxed stairway, whose condition is visible and quite obvious. C, employed by B in the office, uses the stairway on her way to work, slips on it, and is injured. Her only alternative to taking the risk was to forgo her employment. A is subject to liability to C."

If we adopt that illustration so that it reflects the facts of the case at bar, the illustration would read as follows:

> "A owns an office building, in which he rents an office for business purposes to B. The only approach to the office is over a slippery waxed stairway, whose condition is visible and quite obvious. C, employed by B in the office, contemplates the slippery waxed stairway before using it, and complains about its condition to B, who in turn complains to A, the building owner.

A advises B that he has requested the services of a stairway-maintenance company, whose representatives are on the way. A suggests to B that C wait until the condition has been remedied, but B, notwithstanding the foregoing, directs C to climb the stairway and report for work. C, doing so, slips on the stairway and is injured."

The imposition of liability upon A in such an illustration, and equally, the imposition of liability upon the defendant shipowner in the case at bar, cannot be justified by appeal to the Restatement or to the decision in *Napoli.* On the contrary, such an imposition of liability would do violence to principles of negligence law reflected in those very authorities.

As noted *supra,* in *Napoli* the Second Circuit took pains to point out that application of the Restatement's "obvious danger" standard in LAHWCA cases would not contravene the Congressional intent, expressed in the 1972 amendments, that a vessel owner is liable to longshoremen "only for injuries resulting from obvious dangers which it should reasonably anticipate that the longshoremen would be unable to avoid." 536 F.2d at p. 509. Furthermore, liability under *Napoli* requires a showing that "the shipowner was negligent in not correcting the open and obvious danger . . ." *Ibid.* The plaintiff bears the burden of establishing both elements. In the case at bar there was a total failure of proof as to each of them. Defendant had no reason to anticipate that the longshoremen would not await the additional dunnage, which would have enabled them to avoid the hazard; and there is no evidence that defendant's efforts to obtain more dunnage, in order to correct the danger, were less than they could have been in the circumstances.[3] A jury could not find for plaintiff on this

---

**3.** It is no answer for plaintiff to say that defendant should have anticipated the need for a greater quantity of dunnage and had it on hand before work commenced. In the first place, such a finding of negligence would have to be based upon underlying findings that the shipowner knew that the drums of tallow were destined for loading on the CHIRON in suffi- cient time to order additional dunnage in advance, factual propositions for which there is no evidence at all. Secondly, assuming *arguendo* a basis for inference of such negligence, its consequence was limited to the creation of an obvious hazard of which plaintiff was aware; and so we simply return to square one.

**534**

state of the record without departing from the guiding principles of the statute.[4]

### III.

For the foregoing reasons, defendant's motion for directed verdict is granted. The Clerk of the Court is directed to enter judgment dismissing the complaint.

It is So Ordered.

---

4. The imposition of liability upon the shipowner, in the circumstances of this case, would be tantamount to a return to the discarded concept of liability based upon unseaworthiness.