Donald E. POWERS, Plaintiff,
Appellant,

v.

BETHLEHEM STEEL CORPORATION,
Defendant, Appellee,

v.

McKIE LIGHTER CO., INC.,
Defendant, Appellee.

Donald E. POWERS, Plaintiff,
Appellant,

v.

McKIE LIGHTER CO., INC.,
Defendant, Appellee.

Nos. 72–1197, 72–1198.

United States Court of Appeals,
First Circuit.

Heard March 7, 1973.

Decided April 9, 1973.

Rehearings Denied May 10, Aug. 23, 1973.

Michael B. Latti, Boston, Mass., with whom Robert S. Wolfe, and Kaplan, Latti & Flannery, Boston, Mass., were on brief, for plaintiff-appellant.

Leo F. Glynn, Boston, Mass., for defendant-appellee, McKie Lighter Co., Inc.

Charles E. Colson, Boston, Mass., with whom Cargill, Masterman & Cahill, Boston, Mass., was on brief, for defendant-appellee, Bethlehem Steel Corp.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant Powers, a pile driver employed by McKie Lighter Co., suffered a serious eye injury as he stood on a McKie-owned raft next to Pier 3 of the Bethlehem shipyard in Boston. McKie was under contract with Bethlehem Steel Corporation, the owner of the pier, to repair the pilings underneath. Powers, who received compensation for the injury under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., commenced separate actions in the district court against McKie, claiming damages under the Jones Act, 46 U.S.C. § 688, and damages and maintenance and cure under general maritime law; and against Bethlehem, under diversity jurisdiction, claiming damages for negligence. The jury returned substantial verdicts against both defendants, jointly and severally. Powers appeals from the district court's entry of judgments notwithstanding the verdicts in favor of both defendants, D.C., 343 F.Supp. 17.

Standing under the pier on a raft or "float" owned by McKie, Powers and other workmen would first clean the piles by chipping and sandblasting, and then place a form around them into which concrete would be poured. The raft was about twenty-five feet long and five feet wide. Without deck or railing, it was made of 12 by 12 timbers, bonded together. There were rings for lines at its four corners. The men would descend by ladder to the raft, which when not in use lay tied to the pier, lower to the raft sandblasting equipment, water pumps, and forms to be placed around the pilings, and move the raft under the pier to the piles by poling or pulling on lines attached to the pier. They would tie the raft to a larger raft on opposite sides of a row of piles, and span the rafts with planks, so that they could move between and work around the piles. Lines containing water, air, steam and electricity for cleaning, sandblasting and lighting were led from the pier by the men on the raft to where they were working.

The pier was thirty to forty feet wide. The raft's only movement was from the pier front to the piles underneath or from one row of piles to another. Even when so moving it was normally attached by at least one line to the pier.[1] It had earlier been towed by a workboat to Pier 3 from Pier 2 and had also been towed through Boston harbor to other jobs.

The lighting for the work area, supplied by Bethlehem, consisted of drop lines with a male plug at one end, plugged into a fuse box, and a socket at the other with a bulb in it. The line would be slung over the side of the pier, and taken under the pier by a workman. Some but not all of the bulbs had reflectors. None had protective covering around them. The bulbs had popped frequently while the men worked, some-

---

1. Sometimes, men on the pier would hold a line to guide the raft under the pier. There was a suggestion in the testimony that at a point when the raft was moving under the pier the man on the pier would drop the line to a man on the raft, but it is clear from the testimony that the raft was unattached to the pier, if at all, for only a matter of minutes.

times when Bethlehem supervising employees were present. As late as the week of the accident, a bulb had popped in their presence. Powers had twice complained to the Bethlehem job supervisor, recommending that the bulbs be surrounded with a steel or wire cage, with a piece of plexiglass enclosure. There is no evidence of what response Powers received, if any.

The accident happened before daylight, as Powers, standing on the raft, then attached to the pier, was preparing to move it about twenty feet to piles under the pier.[2] The light cable, supplied by a Bethlehem employee to a McKie employee, lay hanging over the side of the pier, the bulb about ten to thirteen feet above Powers' eye level. The bulb was unprotected. When Powers looked up toward the light, the bulb popped, sending pieces of glass into his eye.

■ ■ This case is one more taking us literally to the water's edge, having to do with the circumstances under which a harbor-worker may become entitled to a seaman's remedies. *See* Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). Recovery under the Jones Act or under the general maritime law for unseaworthiness requires affiliation with a "vessel"—either as a crew member or as one injured aboard doing seaman's work. Swanson v. Marra Brothers, Inc., 328 U.S. 1, 4, 7, 66 S.Ct. 869, 90 L.Ed. 1045 (1946); Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 99, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). We believe the raft upon which Powers was injured was not a vessel.

■ What is a vessel, like who is a crew member, is "except in rare cases", a jury question. Offshore Company v. Robison, 266 F.2d 769, 780 (5th Cir. 1959). Nevertheless, the broad parameters of definition must be established if

the terms are to have content. If what emerges from facts and inferences taken most favorably to the plaintiff[3] cannot be a vessel, the jury may not make it one. *See* Thibodeaux v. J. Ray McDermott & Co., 276 F.2d 42, 46 (5th Cir. 1960); Hill v. Diamond, 311 F.2d 789, 792–793 (4th Cir. 1962); Texas Company v. Savoie, 240 F.2d 674, 675 (5th Cir. 1957); rehearing denied, 242 F.2d 667 (5th Cir. 1957); cert. denied, 355 U.S. 840, 78 S.Ct. 49, 2 L.Ed.2d 51 (1957).

■ We agree with the 5th Circuit in Cook v. Belden Concrete Products, Inc., 472 F.2d 999 (5th Cir. 1973), that a floating construction platform secured to land is not a vessel for purposes either of the Jones Act or general maritime law. The non-vessel in *Cook* was a flat-deck barge, 180 by 54 feet, upon which employees fabricated concrete barges. Equipped with pipes and pumps for flooding or evacuating interior compartments, but without its own propulsion, it was occasionally moved to different positions alongside the dock to pick up materials, would be towed into deeper water to launch completed barges, and had been towed considerable distances. While barges were being fabricated, it was fastened by ropes to the dock. The court said, at 1001:

. . . . in the instant case the floating construction platform was capable of limited movement and was, in the normal course of its service, towed from point-to-point in the navigable waters. . . . The permanence of fixation, however, is not the criterion which governs the maritime status of floating dry docks and similar structures. As the Supreme Court pointed out in *The Robert W. Parsons* [191 U.S. 17, 30, 24 S.Ct. 8, 48 L.Ed. 73 (1903)] the "determinative factors upon the question of jurisdiction [are]

---

2. There is some suggestion in testimony that the raft may actually have commenced its movement under the pier.

3. We have considered the evidence in the light most favorable to appellant, in-

cluding evidence made as an offer of proof after exclusion by the court, and give him the benefit of every favorable inference. Rainey v. Gay's Express, Inc., 275 F.2d 450, 451 (1st Cir. 1960).

the purpose for which the craft was constructed and the business in which it is engaged". . . .

*Cook, supra,* relied on cases emanating from Cope v. Vallette Dry-Dock Company, 119 U.S. 625, 627, 7 S.Ct. 336, 30 L.Ed. 501 (1887), that a floating dry-dock is not a vessel. *See* Atkins v. Greenville Shipbuilding Corp., 411 F.2d 279, 283 (5th Cir. 1969), cert. denied, 396 U.S. 846, 90 S.Ct. 105, 24 L.Ed.2d 96 (1969).[4] In our own case of DeMartino v. Bethlehem Steel Co., 164 F.2d 177, 179 (1st Cir. 1947), holding that a floating dock was not a vessel, we cited Berton v. Tietjen & Lang Dry Dock Co., 219 F. 763 (D.N.J.1915), in which, at 771, the court said,

. . . A stage designed to be used in connection with painting or repairing the side of a vessel would not become [a vessel] merely because it was capable of floating on the water, though it were used by workmen in thus painting and repairing, while the same was on the water, rising and falling with the tide, or because it could be moved alongside or around such vessel, and while being moved was capable of holding persons and property. . . .

The purpose and business of the present craft was not the transportation of passengers, cargo, or equipment from place to place across navigable waters. It was tied to the pier or its pilings virtually all of the time. Nearly as long as the pier was wide, it was used to provide a stable platform for men repairing defective piles. While so used, it was lashed with the other raft to piles, planks being placed from raft to raft, and was indistinguishable from a permanent floating dock. *See* DeMartino v. Bethlehem, *supra.* Its brief movement consisted of being hauled, poled or paddled from the pier to the piles underneath, or from pile to pile; even when moving it was usually attached to the pier by one or more lines. Its occasional "voyages"—when towed by workboat from one pier to another—were no different from the dragging of a section of floating dock from one location to another. *See* Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co., *supra,* 271 U.S. at 20–21, 46 S.Ct. 379; *Cook,. supra,* 472 F.2d 1001, n. 5.

■ Rafts, of course, may be designed or used "to encounter perils of navigation" (*See* Evansville v. Chero Cola Co., *supra,* 271 U.S. at 22, 46 S.Ct. 379); if so they may be vessels. *See* The Mary, 123 F. 609 (S.D.Ala.1903); United States v. Marthinson, 58 F. 765 (E.D.S.C.1893); Seabrook v. Raft of Railroad Cross-Ties, 40 F. 596 (D.S.C. 1889). But we cannot reasonably describe the present raft as other than a floating stage. Even with men and equipment on it, its movement, amounting mostly to a positioning under the pier incidental to its intended use, was not navigation.

■ The raft, moreover, was unlike special purpose floating structures whose function requires exposure to the hazards of the sea usually at some distance from the shore, such as barges, dredges, drilling platforms and floating derricks. *See* Offshore Company v. Robison, *supra,* 266 F.2d at 772 (mobile drilling platform with retractable legs, having a raked bow, navigation lights,

---

4. Somewhat related is the Supreme Court's classification of a so-called wharf boat as a non-vessel. Evansville & Bowling Green Packet Co. v. Chero Cola Co., 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805 (1926). Secured to the shore, with quarters for men abroad and shore based power and plumbing connections, the huge craft was towed each winter to a more sheltered harbor, and had sometimes been towed considerable distances. The statutory "vessel" definition under consideration in that case—"every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water"—was virtually the same as that in 46 U.S. § 801, arguably applicable to Jones Act cases. *See* 7A Moore's Federal Practice ¶ .215[4]. The quoted language has never been construed as meaning simply every floating object capable of bearing weight without sinking. *See,* e. g., Hill v. Diamond, *supra,* 311 F.2d at 792–793.

bitts, anchors, bilge pumps, cranes and life rafts, located at the time of the accident three miles offshore); Summerlin v. Massman Const. Co. et al., 199 F.2d 715, 716 (4th Cir. 1952) (derrick anchored in a river); Gahagan Const. Corporation v. Armao, 165 F.2d 301, 305 (1st Cir. 1948) (dredge on which crew slept and ate). *Also compare* Stafford v. Perini Corporation, 475 F.2d 507 (1st Cir. 1973) (construction barge anchored two miles offshore, assumed to be vessel). These navigable craft, like conventional vessels, retain their status even when berthed for long periods or even when resting upon or attached to the bottom. *See* Gianfala v. Texas Company, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775 (1955), reversing, Texas Company v. Gianfala, 222 F.2d 382 (5th Cir. 1955).

■■ It may well be that when a craft not designed or generally used as a vessel is in actual navigation—such as when, unattached to land, it is under tow for an appreciable distance over navigable water—it will temporarily acquire a vessel's status. *See* United States v. Moran Towing & Transportation Co., 374 F.2d 656 (4th Cir. 1967), *Cook, supra.* However, even were the jury on conflicting evidence to have concluded that Powers' injury occurred while the raft was in process of being hauled under the pier, we do not consider such movement to be navigation.[5] Attached by a line to the pier, the raft remained a work platform while being so maneuvered into position, a distance

of about twenty feet. We sustain judgment for McKie.[6]

■■ We next consider whether appellant may be allowed to recover against Bethlehem. We do not agree with him that Bethlehem's negligence is to be determined under general maritime law. *See* Kermarec v. Compagnie General, 358 U.S. 625, 628, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 259, 42 S.Ct. 475, 66 L.Ed. 927 (1922). Maritime law applies only where the wrong occurring on or over navigable waters "bear[s] a significant relationship to traditional maritime activity." Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). It would be incongruous to hold that the required relationship existed here, in the face of our conclusion that the raft was not a vessel, but, being a floating work platform, was, in effect, an extension of the pier, itself an extension of the land. *See* Victory Carriers, Inc. v. Law, *supra,* 404 U.S. at 206–207, 92 S.Ct. 418. Powers, a landbased piledriver, employed to repair piles from the platform, was injured by a bulb hanging over the pier. We see nothing either in his occupation or in the circumstance of the accident to invoke the law of admiralty, "designed and molded to handle problems of vessels relegated to ply the waterways of the world." Executive Jet Aviation, Inc. v. City of Cleveland, *supra,* 409 U.S. at 269, 93 S.Ct. at 505.

5. Besides the short distance from pier to pilings, and the fact the raft remained attached to the pier, we note that piers and docks have traditionally been "deemed extensions of land". Victory Carriers v. Law, *supra,* 404 U.S. at 206–207, 92 S.Ct. 418. To term movement thereunder of this sort "navigation" would seem as strained as to call the raft a "vessel" or Powers its "crew".

6. The district court erred in ruling alternatively that § 905 of the Longshoremen's and Harbor Workers' Act, 33 U.S.C. § 901 et seq., barred Powers' action against McKie because Powers had collected

compensation and had testified in support of his compensation claim. It was settled, at least before amendment in October, 1972, that § 905 did not bar a longshoreman or harbor worker's action against his employer, who owned the vessel where the injury occurred, despite the worker's having collected compensation. Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963); Jackson v. Lykes Steamship Co., 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967); Biggs v. Norfolk Dredging Co., 360 F.2d 360 (4th Cir. 1966). *But see* Pub.Law 92–576, 86 Stat. 1251, § 18(a) (1972), amending § 905.

We thus turn to whether under Massachusetts law the jury could have found that Bethlehem violated a duty owed Powers. A Massachusetts landowner owes to the employees of an independent contractor only the same duty he owes his own employees, "and that duty [is] to disclose hidden defects of which the defendant was aware or of which in the exercise of reasonable care it should have known. Except in cases of hidden defects, the employer owes no duty to alter the conditions where the work is to be done or to make them safe for the employee." Burr v. Massachusetts Electric Company, 356 Mass. 144, 147, 248 N.E.2d 492, 495 (1969).[7] This rule, now mitigated in virtually all cases (as in Powers') by comprehensive workmen's compensation laws, was established in an earlier era when the cost of industrial accidents was but rarely imposed on an employer. Whatever its shortcomings, we are bound by it. The defect in the light bulb was not hidden; Powers had noticed bulbs popping and had in fact complained about the danger to Bethlehem employees. That appellant had not seen the light bulb which exploded is unimportant, given his familiarity with the bulbs' propensity to pop and their lack of shielding.[8]

Appellant's argument that Bethlehem violated a duty to supply safe equipment must fail also, since recovery would depend on Powers' not knowing that the equipment was defective. Cf. Mulchey v. Methodist Religious Society, 125 Mass. 487, 489 (1878); White v. Newborg, 208 Mass. 279, 281, 94 N.E. 269, 270 (1911). See Restatement of Torts 2d § 496A, comment c(3), § 496C. We thus affirm the judgment for Bethlehem against Powers.

We find merit in none of the appellant's remaining contentions, dealing mostly with the exclusion of evidence at trial. The verdict in his favor cured any possible prejudice before the jury. We ourselves have considered and, for purposes of this decision have accepted in its aspect most favorable to appellant, the excluded proof relative to the status of the raft. Other exclusions, such as of certain evidence relative to his alleged crew status, were harmless in view of our conclusion that the raft was not a vessel. Given our disposition of the case, the district court's unwillingness to allow appellant to amend the complaint could not have been prejudicial.

Affirmed.

---

7. *See also* Barrett v. Foster Grant Co., 450 F.2d 1146 (1st Cir. 1971); DeMartin v. New York, New Haven & H. R.R. Co., 336 Mass. 261, 143 N.E.2d 542 (1957); Hannon v. Hayes-Bickford Lunch System, Inc., 336 Mass. 268, 145 N.E.2d 191 (1957); Gallo v. Leahy, 297 Mass. 265, 8 N.E.2d 782 (1937); Faverau v. Gabele, 262 Mass. 118, 159 N.E. 738 (1928).

8. Powers' earlier unheeded requests for shielding indicated that he knew of the likelihood of danger as well as of the possibility of the bulbs' popping. Restatement of Agency 2d, § 521, comment b; § 522.