Karen MURPHY et al., Plaintiffs, Appellants,

v.

WOODS HOLE, MARTHA'S VINEYARD AND NANTUCKET STEAMSHIP AUTHORITY, Defendant, Appellee.

No. 75–1423.

United States Court of Appeals, First Circuit.

Argued March 3, 1976.

Decided Sept. 30, 1976.

Robert S. Wolfe, Boston, Mass., with whom Sriberg, Berman & Wolfe, Boston, Mass., was on brief, for appellants.

Charles M. Crowley, Jr., Boston, Mass., with whom Parker, Coulter, Daley & White, Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Robert Murphy, an employee of defendant Woods Hole, Martha's Vineyard and

Nantucket Steamship Authority, was injured when the Uncanteena, a vessel owned and operated by defendant, pulled away from the dock while one of its lines was still secured, causing the handle of the winch which Murphy was tending to spin, striking Murphy. Murphy received benefits under the Massachusetts Workmen's Compensation Act, M.G.L. c. 152. He and his wife thereafter brought this action, asserting jurisdiction under 28 U.S.C. § 1333 and alleging that his injury had been caused by defendant's negligence.[1] The complaint also included a claim for loss of consortium as a result of defendant's negligence. After hearing plaintiff's evidence on liability, the district court found for defendant on two separate grounds; namely, (1) that the Massachusetts Workmen's Compensation Act, M.G.L. c. 152, and the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. (as it existed prior to the 1972 amendments which are not retroactive. *Addison v. Bulk Food Carriers, Inc.,* 489 F.2d 1041 (1st Cir. 1974)) were exclusive remedies precluding an action for negligence under the federal maritime jurisdiction; and (2) that plaintiffs did not sustain their burden of proving that Murphy's injuries were "proximately caused by an action of negligence for which his employer is responsible". As we affirm on the first ground, we do not reach the second.

## I

Murphy was employed as an assistant clerk at defendant's terminal on Nantucket Island. His duties included selling ferry tickets, sweeping out the ticket area, keeping the terminal area clean, and turning freight over to customers. He also assisted in lining up motor vehicles for transfer onto the ferry, in driving trucks on and off the ferry, and in docking and undocking the ferries.

Murphy described the docking facility used by defendant's ferries and at which his injury occurred. Locked at the end of the dock was a transfer bridge—a steel and concrete structure about twenty-five feet long and ten feet wide. The bridge could be raised or lowered and thereby aligned with the deck of an incoming vessel to facilitate passage on and off the vessel. There were two winches on either side of the bridge. When a vessel came into the dock, cables attached to the winches would be passed to a deckhand, secured to a hook on the ferry deck, and then winched in to secure the ferry to the transfer bridge. Murphy's responsibilities included operating the transfer bridge and, after a crew member had secured the cables to the vessel, operating the winch. The two-speed winch was manually operated, with an eighteen inch handle.[2] It had a "dog" or brake mechanism which could be activated before the winch was wound in, or later, to prevent it from unwinding.

In the morning of October 25, 1972, Murphy testified that he was leveling out the transfer bridge to enable the Uncateena to back into the dock and unload. After the Uncateena had backed against the bridge, a crew member on board the ferry grabbed the line off the winch and locked it to the portside bit on the deck. Murphy cranked it in and secured it. He then started to walk to the other winch to do the same when he heard the captain of the Uncateena announce over the PA system, "Let go all lines". According to Murphy he walked back to the port winch, released the dog, and "started winding the winch down so that [the deck hand aboard the ferry] could remove it from the vessel" when the Uncateena pulled away, exerting force on the cable and causing the winch and its handle to spin around. Murphy was struck by the spinning handle on the chest, stomach and hand, and thrown to the dock.

---

1. The action was not brought under the Jones Act which provides a remedy for seamen only, 46 U.S.C. § 688, but under general maritime law. *See Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

2. Plaintiff's expert testified to this dimension, and explained that a photograph making it appear that the handle was much longer was a matter of perspective and photography. Notwithstanding, plaintiff describes the handle as four feet long in his brief.

No whistle was sounded as the Uncateena pulled out from the dock. Murphy did not recall having heard any order by the captain to stand clear of the winch. He also said he did not recall having previously been given any instructions as to the proper procedure to follow upon an order to let loose all lines although this was not the first occasion that the vessel had to maneuver in this manner.

An expert witness who stated that he was generally familiar with the docking and undocking of ships stated that the custom and practice of signalling by vessels comparable in size to the Uncateena during docking and undocking varied from locale to locale. In most places of which he was aware the custom and practice was to give signals whenever the operator of a ship undertook any action changing the motion and direction of the ship, particularly where visibility was limited and people might be around the ship, and in practically all cases when the operator's vision was obscured. The expert went on to testify that he could not relate the exact signals given in a particular locale, for example Woods Hole, without investigation.

After receiving the testimony of Murphy and his expert, which comprised plaintiff's case with respect to liability, the court declined to hear more. After considering briefs, it ruled in defendant's favor on the grounds previously stated.

## II

Although Murphy received compensation from his employer only under the Massachusetts Workmen's Compensation statute, the district court ruled that he was a harbor worker or longshoreman within 33 U.S.C. § 901, the federal Longshoremen's and Harbor Workers' Compensation Act (the "Act"). The court felt that his status under the federal Act barred him from suing his employer, as § 905 thereof provides that

"the liability of an employer . . . shall be exclusive and in place of all other liability of such employer to the employee . . . ." On this assumption, and on the further assumption that the force of § 905 was not diminished by the line of Supreme Court decisions nullifying § 905 with respect to claims for unseaworthiness,[3] the district court held that Murphy could not recover from his employer for negligence. The court also based its decision upon § 24 of M.G.L. c. 152 providing that an employee "shall be held to have waived his right of action . . . under the law of any other jurisdiction in respect to an injury therein occurring, to recover damages for personal injuries" if he does not give his employer written notice at the outset of his employment that he claims such right.

We agree with the district court that Murphy may well have come under the federal Act, although the issue is not simply a question of determining whether he was a longshoreman or harbor worker. Under the wording of the pre-1972 Act, only injuries occurring seaward of the pier, the so-called *Jensen* line, are compensable under the Act. *Nacirema Operating Co. v. Johnson*, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969); *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). Murphy's personal status as a harbor worker would not alone be determinative. *See Stockman v. Clark*, 539 F.2d 264 (1st Cir. 1976). State compensation acts covered injuries shoreward of the pier and also extended into a "twilight zone" of overlapping federal-state coverage seaward of the pier. *See Davis v. Department of Labor*, 317 U.S. 249, 252–53, 63 S.Ct. 225, 87 L.Ed. 246 (1942). *But see* 33 U.S.C. § 903. Here the injury occurred on a movable transfer bridge which apparently served as a gangway over which persons and vehicles boarded and disembarked. In *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 207, 92 S.Ct. 418,

---

**3.** Actions for unseaworthiness have been held to be maintainable by a longshoreman against a shipowner-employer notwithstanding the contrary language of § 905. *Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963) and *Jackson v. Lykes Bros. S.S. Co.*, 386

U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967). The district court relied upon a ninth circuit decision, *Arvidson v. Dillingham Corp.*, 462 F.2d 1 (1972), to distinguish negligence actions from actions for unseaworthiness.

30 L.Ed.2d 383 (1971), the Supreme Court spoke of the gangway as the dividing line between admiralty and state jurisdiction, indicating that the former applied to accidents occurring "aboard ship or on the gangplank". *Id.* at 213–14, 92 S.Ct. at 426. *See Romero Reyes v. Marine Enterprises, Inc.*, 494 F.2d 866 (1st Cir. 1974). As Murphy's injury occurred on a structure that was seemingly a gangplank, it is likely that he came within the coverage of the federal act.

If so, the question arises whether the liability of his employer created by the Act was exclusive, that is whether it precluded maintenance of the instant negligence action against the employer. Section 905 appears to say precisely that; like most state workmen's compensation systems, the federal Act on its face reflects a trade-off between the certainty of benefits and the limitation of employer liability. *See Griffith v. Wheeling-Pittsburgh Steel Corp.*, 521 F.2d 31, 42 (3d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). But things are not always what they seem, and here we are faced with what Judge Gibbons in *Griffith* calls the ghost of *Sieracki-Ryan*—a presence so powerful that the court in *Griffith*, putting aside what it conceded to be logic and reason, felt impelled to construe even the 1972 amendments of the Longshoremen's and Harbor Workers' Act in a manner at variance with the express statutory policy; *but see Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 113 n. 6, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974).

What has been described as the effective judicial repeal of § 905 developed as a consequence of the extension of the unseaworthiness remedy to longshoremen, *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), followed by the granting of a right of indemnification to the shipowner against the stevedore-employer of the injured longshoreman if a breach of the stevedore's warranty of workmanlike performance has contributed to the injury. *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The first step, accomplished in *Sieracki*, made the vessel owner a virtual insurer of longshoremen working on his vessel, so that he was liable for injuries most of which were not his fault but the fault of the stevedore who hired and supervised the longshoremen. The second step, accomplished in *Ryan*, relieved the shipowner from the ultimate burden, but, in so doing, removed as a practical matter the protection afforded an employer under § 905, since the stevedore became liable for his employee's injury even though not directly liable to the employee. Finally, in *Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), a majority of the Supreme Court, bowing to what they apparently viewed as the inevitable consequences of *Sieracki* and *Ryan*, held that an injured longshoreman could sue his own employer directly for unseaworthiness when the latter was effectively the owner of the vessel on which the longshoring injury occurred. While the decision was recognized to be contrary to the plain language of the Act, the Court felt that a different result would be "harsh and incongruous", since it would in effect deprive the longshoreman of the right to a seaworthy vessel simply because of the fortuitous (and rare) circumstance that his own employer owned the vessel. *Id.* at 415, 83 S.Ct. 1349. *See also Jackson v. Lykes Bros. S.S. Co.*, 386 U.S. 731, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1967).

The question is whether the logic of the Supreme Court decisions dealing with unseaworthiness claims abrogates § 905 with respect to a harbor worker's claim based on an alleged negligent action of the vessel. The Supreme Court has not confronted this issue,[4] but the ninth circuit, in *Arvidson v. Dillingham Corp.*, 462 F.2d 1, 4, *cert. denied*,

---

4. As the district court recognized, claims for both negligence and unseaworthiness were before the Supreme Court in *Jackson v. Lykes Bros. S.S. Co.*, 386 U.S. 731, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1967), but the Court addressed itself only to the unseaworthiness claim. In the usual situation where unseaworthiness is the stronger claim, the presence or absence of

409 U.S. 983, 93 S.Ct. 321, 34 L.Ed.2d 247 (1972), concluded that the *Sieracki-Ryan* line of cases applies only to actions for unseaworthiness. The *Arvidson* court saw a "clear distinction" between liability resting on unseaworthiness and liability based on negligence—in part because seaworthiness is a "traditional, absolute, and nondelegable obligation" of a shipowner. *Id. quoting Reed v. The Yaka, supra,* 373 U.S. at 415, 83 S.Ct. 1349. The *Arvidson* court also quoted at length, in a similar vein, from *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 498–99, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

While *Arvidson* is the only circuit case directly in point, the third circuit, as noted, has gone so far as to hold that under the 1972 amendments to the Act, negligence claims against an employer who is also a vessel owner are not barred by exclusivity language in § 905 that has remained unchanged.[5] *Griffiths, supra,* 521 F.2d at 42–43. The amended Act, which greatly increases compensation benefits, now prohibits claims for unseaworthiness. And while it allows negligence claims against the vessel "as a third party", it goes on to state that an employer shall not be liable to the vessel in such circumstances. By eliminating the possibility of indirect recovery against the employer through the device of indemnity, the 1972 amendments might seem to remove the *Ryan* dilemma, and pave the way for once more giving effect to the exclusivity provision. However, the third circuit did not see matters that way, and we need not address the question here.

The question we face is simply whether or not the metaphysics of *Sieracki-Ryan-Reed* nullify the exclusivity provision of the Act with respect to an action that is not brought by a longshoreman and that is neither of the same character, nor arises in the same context, as those in the controversial Supreme Court decisions. We think not.

There are, to be sure, respectable arguments for reaching a contrary result: (1) Justice Black's broad language in *Reed*;[6] (2) a tendency (particularly by critics of the *Ryan-Reed* decisions) to suggest that nothing much is left of § 905, see, e. g., G. Gilmore & C. Black, The Law of Admiralty 446 (2d ed. 1975), but see *id.* at 390; and (3) cases indicating that the shipowner's right to indemnification by the stevedore may encompass even situations where the shipowner is negligent and the stevedore is not. *E. g., Italia Societa v. Oregon Stevedoring Co.,* 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964).

■ Running counter to these arguments, however, is the fact that the *Ryan-Reed* decisions arose in a stevedoring context, as a direct outgrowth of the application of the unseaworthiness doctrine to the peculiarities of that profession. A longshoreman's customary work place is not his employer's factory but is often a vessel, usually owned by another. Once the vessel owner was made liable virtually without fault to any longshoremen injured on his vessel, it seemed only right to permit reimbursement by the stevedore, an independent contractor who, more often than not, was

---

an accompanying negligence claim is likely to be of little significance, and we think the conjoining of a negligence claim in *Jackson* is of no precedential value here.

**5.** Plaintiffs assert that this circuit in *Powers v. Bethlehem Steel Corp.,* 477 F.2d 643, 648 n. 6 (1st Cir. 1973), implicitly ruled that an action for negligence, like an action for unseaworthiness, is not barred by § 905. But *Powers* dealt with a Jones Act negligence claim which could only be maintained by a seaman; and as the Longshoremen's and Harbor Workers' Compensation Act does not apply to seamen the effect of § 905 of the Act was irrelevant to our decision in *Powers* as regards the negligence

claim. *See Victory Carriers, Inc. v. Law,* 404 U.S. 202, 212 n. 12, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971).

**6.** While *Reed* speaks entirely to unseaworthiness, Justice Black said early in the opinion, at 413, 83 S.Ct. at 1352, "We further held [in *Sieracki*] that the Longshoremen's and Harbor Workers' Act was not intended to take away from longshoremen the traditional remedies of the sea, so that recovery for unseaworthiness could be had notwithstanding the availability of compensation." A claim for negligence under the maritime law may be termed such a traditional remedy.

the party responsible for the "unseaworthy" condition that created the liability. It was this chain of logic that led to the undermining of § 905, since once indemnity was permitted, it seemed an empty formalism to deny a direct action when the vessel owner happened also to be the longshoreman's employer. But no such underlying logic applies to negligence claims of the present variety. The owner of the ferry is liable only if the vessel itself was actually negligent; the negligent owner would not ordinarily have a right over against plaintiff's employer were the latter a separate entity. *See Cooper Stevedoring Co. v. Fritz Kopke, Inc., supra,* 417 U.S. at 114–15, 94 S.Ct. 2174. The situation, in other words, is no different in any respect from the usual industrial injury situation where tort recovery against the employer is prohibited in return for the broader protection of workmen's compensation coverage. In such circumstances, it is hard to think of an appropriate reason for simply ignoring Congress' clear command in § 905.

■ The situation might be different were this negligence action conjoined with an action for unseaworthiness and based, for example, upon some misadventure connected with the stowage of cargo. There the stevedore's implied warranty of proper stowage might well impose liability even for faults of the vessel, whether termed unseaworthiness or negligence, and the *Ryan-Reed* logic would apply. But here we deal with negligence of the vessel in its ordinary sense; and we are not persuaded that the Supreme Court would simply ignore the plain language of the Act where the principal causative factors that underlay *Ryan* and *Reed* are missing.

It is true that the Supreme Court's rationale in *Reed* cuts a broad swath, but we think it needlessly discrediting [7] to that Court to read *Reed* as an exercise in judicial power rather than as an attempt to come to terms with what was, in fact, a most difficult dilemma created in the wake of *Sieracki* and *Ryan.* So read, neither *Reed* nor its successors reach the exclusivity provision of § 905 insofar as concerns actions of the present character. We therefore give § 905 its ordinary meaning, and hold that a negligence action of the present character, brought by a harbor worker covered by the pre-1972 Act for injuries caused by the alleged actual negligence of a vessel owned by his employer, is barred by § 905.[8]

### III

■ We must also deal with the possibility that Murphy was subject to exclusive state rather than federal workmen's compensation jurisdiction. While as previously discussed, his injury occurred on a gangway-like structure that probably placed him seaward of the *Jensen* line, and thus subject to the federal Act, the niceties of that question were not litigated below, and we hesitate to rule definitively given the state of the record. We thus inquire as to his rights in the event he was covered solely under the Massachusetts Workmen's Compensation Act, which provides that an employee waives his rights under both common law and "the law of any other jurisdiction" to recover damages unless he has notified his employer when hired that he is retaining such rights. (It is not claimed that Murphy did so.) We hold that the federal negligence remedy under which Murphy is suing should be construed so as to give effect to the state waiver.

Although it is a close question whether Murphy was injured on "navigable waters" (viz., seaward of the *Jensen* line) for purposes of coverage under the former Longshoremen's and Harbor Workers' Act, there is no question that his tort claim against the vessel, if otherwise maintainable, is cog-

---

7. Referring to *Reed,* one commentator has gone so far as to write "Justice Black's majority opinion hardly bothered to pretend that the result could be justified by a construction of the statutory language, however, disingenuous." G. Gilmore & C. Black, The Law of Admiralty 445 (2d ed. 1975).

8. Mrs. Murphy's independent claim for loss of consortium is also barred by § 905. *See Smither & Co. v. Coles,* 100 U.S.App.D.C. 68, 242 F.2d 220, *cert. denied,* 354 U.S. 914, 77 S.Ct. 1299, 1 L.Ed.2d 1129 (1957).

nizable under federal maritime law. 46 U.S.C. § 740. *See Gutierrez v. Waterman S. S. Corp.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Pope & Talbot, Inc. v. Hawn, supra,* 346 U.S. at 409, 74 S.Ct. 202. The question, therefore, is whether in these interstices of admiralty tort jurisdiction, the federal courts should give effect to exclusivity features within the state workmen's compensation law that are comparable to those found in the federal law. We think the answer is in the affirmative. Actions by the state which are contrary to federal laws or to the essential features of an exclusive federal jurisdiction would, of course, have to give way. *See Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 341, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). But as Justice Frankfurter has written, "to claim that all enforced rights pertaining to matters maritime are rooted in federal law is a destructive oversimplification of the highly intricate interplay of the States and the National Government in their regulation of maritime commerce. . . . Maritime law is not a monistic system. The State and Federal Governments jointly exert regulatory powers today as they have played joint roles in the development of maritime law throughout our history." *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 373–74, 79 S.Ct. 468, 480–81, 3 L.Ed.2d 368 (1959).

Here federal compensating law, if applicable, would itself preclude recovery against the employer and this is an area where state and federal compensation laws overlap, and where, indeed, Congress prior to 1972 consciously limited the federal Act so as only to supplement the state compensation laws, *see Nacirema Operating Co. v. Johnson, supra,* 396 U.S. 212, 90 S.Ct. 347. There is thus good reason to give effect to the state waiver provision, and to interpret the federal negligence remedy in harmony with overall Congressional no less than state expectations. No doubt the opposite result would be indicated were we to find that § 905 of the federal Act did not bar Murphy's claim. *Cf. Pope & Talbot, Inc. v. Hawn, supra,* 346 U.S. at 409–10, 74 S.Ct. 202. But where we deduce a federal policy in conformity with the state's, there can be no reason to deny effectiveness to the state provision. In *Arvidson, supra,* 462 F.2d 1, the ninth circuit had before it a similar mixture of state and federal compensation coverage, reaching the same result we reach here.

*Affirmed.*

COFFIN, Chief Judge (dissenting).

Although the question is a very close one, I cannot, upon reflection, agree with the majority's conclusion that § 5 of the Act bars an individual, who is subject to its terms, from recovering against an employer whose negligent operation of his vessel was the proximate cause of the employee's injury. Although I appreciate that there are arguments for the proposition that the judge-made exceptions to § 5 should have no applicability to negligence actions, I think the Court's opinions in *Reed v. The Yaka,* 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963) and *Jackson v. Lykes,* 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967) strongly suggest, if they do not compel, a contrary result. However unsatisfactory these opinions may be as matters of statutory construction, I can find no warrant to disregard their plain teachings. The Supreme Court has said nothing to discredit them, *see Buzynski v. Oliver,* 538 F.2d 6 (1st Cir. 1976) and Congress has not, insofar as this case is concerned, attempted to overrule them.[1]

---

1. Although I dissent, I emphasize that I do not view my interpretation of pre-1972 law as having any substantial implications for the interpretation of the Act as amended in 1972. The amended § 5 constitutes a clear attempt by Congress to overrule the line of cases culminating in *Reed, see Cooper Stevedoring Co. v. Kopke, Inc.,* 417 U.S. 106, 113 n. 6, 94 S.Ct.

2174, 40 L.Ed.2d 694 (1974), and I would not feel haunted by *Reed's* ghost if I were called upon to construe the 1972 amendments. It appears that Congress has commanded us to wipe the slate clean. *But see Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31 (3d Cir. 1975).

Although I do not quarrel with the majority's discussion of *Reed* and *Jackson's* precursors, I think it useful to summarize my own understanding of the statutory background of this case. Section 5 of the Act bars, in language which admits no exceptions, all actions at law or in admiralty by a longshoreman against his employer. Section 33, however, preserves the longshoreman's rights against individuals other than his employer, generally a shipowner. After *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), a longshoreman's remedies against a third party-shipowner included an unseaworthiness action, as well as the traditional negligence remedy. The Act, as written, provided no clear answer to the question whether a shipowner, who was found liable to a longshoreman, had any rights against the longshoreman's employer. In *Halcyon Lines v. Haenn Ceiling & Refitting Corp.*, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), the Court held that a shipowner who had been found liable to a longshoreman in negligence, had no right to contribution against the longshoreman's employer. Although *Halcyon* reserved the point, *id.* at 286 n. 12, 72 S.Ct. 277, subsequent decisions interpreted *Halcyon* as establishing the proposition that § 5 precluded imposing liability on an employer by reason of the employer's having breached a duty he owed a longshoreman. *See Cooper Stevedoring Corp. v. Kopke, Inc.*, 417 U.S. 106, 112–15, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). *Halcyon*, however, proved not to be the Court's last word on the subject. In *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court held that a shipowner had a right to full indemnification from the longshoreman's employer if the employer had breached its warranty of workmanlike service—which the Court implied into the stevedoring contract—and thereby caused the longshoreman's injury. This right of indemnification existed whether the basis of the shipowner's liability to the longshoreman was negligence, *see Weyerhaeuser Steamship Co. v. Nacirema Operating Co.*, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958), or unseaworthiness. *See Crumady v. The Joachim Hendrik Fisser*, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959).

Although *Ryan* and its progeny produced results that were arguably inconsistent with *Halcyon* and § 5, their reasoning was consistent with these authorities. *See Reed v. The Yaka, supra* at 418, 83 S.Ct. 1349 (Harlan, J., dissenting); *compare Italia Societa v. Oregon Stevedoring Co., Inc.*, 376 U.S. 315, 321, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). Nothing in the statute or in *Halcyon necessarily* precluded the imposition of liability on an employer by reason of the employer's having breached a duty it owed the shipowner. I note that the employer, by entering into a contract that expressly provided that there was no warranty, presumably could have avoided indemnification liability. *But see* Proudfoot, *"The Tar Baby": Maritime Personal Injury Indemnification*, 20 Stat.L.Rev. 423 (1968) (suggesting the employer's duty to the vessel owner is grounded in tort).

Although it is not clear that the majority is making a contrary assumption, I also note that the shipowner's right to indemnification was by no means automatic. He had to establish both a breach of warranty and a causal relationship between the breach and the longshoreman's injury. I presume that there have been cases in which the shipowner was wholly responsible for the state of affairs which caused the longshoreman's injury. *See* Proudfoot, *supra*, 20 Stan.L.Rev. at 437.

Although *Ryan* is at least arguably consistent with *Halcyon* and § 5's literal command, the cases which I find most germane to the case at bar—*Reed* and *Jackson*—are not, as the Court itself appears to have recognized. *See Reed, supra* at 414, 83 S.Ct. 1349. There the Court permitted a direct action by the longshoreman against his employer, sanctioning the imposition of liability on the employer by reason of its breach of a duty it owed the employee. Although the Court on the facts of *Reed* could have reached the identical result by a different means, *see* G. Gilmore and C.

Black, *The Law of Admiralty* 444–45, it declined to do so. *Id.* at 412, 83 S.Ct. 1349. Nor can *Reed* be explained, as the majority suggests, as simply a means of "short-circuiting" the normal three party procedure of a direct action against the vessel owner, who, in turn, would sue the employer for indemnification. *Jackson v. Lykes, supra,* in reliance on *Reed,* permitted a direct action in a context in which there was no third party vessel owner on the scene. *Reed* and *Jackson* rested on the ground that a longshoreman, who could have recovered in unseaworthiness against a third party shipowner, should have the same rights against a shipowner who also happened to be his employer. *Jackson, supra* at 735, 87 S.Ct. 1419; *Reed, supra* at 415, 83 S.Ct. 1349. Section 5, under these decisions, does not deprive a longshoreman of the "traditional remedies of the sea" in a case in which his employer happens to own the vessel upon which the longshoreman was injured. *See Reed, supra* at 413, 83 S.Ct. 1349.

As reasoned, *Reed* and *Jackson* seem dispositive of the case at bar. Since appellants clearly would have been able to recover against a negligent third party-shipowner, these cases appear to compel the conclusion that appellants should also be able to recovery against a negligent employer-shipowner.

I am not persuaded by the argument that unseaworthiness claimants should have greater rights than negligence claimants. Certainly there is nothing in the language of § 5 that would support such a distinction. While I recognize that unseaworthiness and negligence are distinct remedies, *see Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971), I see nothing in the distinction between the two that suggests that negligence claimants should be discriminated against. Clearly, it is difficult to justify the conclusion that a negligent employer-shipowner is entitled to the protections of § 5 while an employer whose vessel is unseaworthy through no fault of his own is not.

In saying this, I recognize that the result in *Usner* would have made little sense if the Court had believed that a longshoreman had a negligence action against his employer in all cases. *See* G. Gilmore & C. Black, *supra* at 390. There, the employer's negligence—which the Court held did not render the vessel unseaworthy and the vessel owner liable—occurred in the course of stevedoring activities, not in the course of the operation of a vessel. My view, which is consistent with the implications of *Usner,* is that § 5 bars an action if the cause of action does not arise from the employer's activities as a shipowner. *Compare Atkins v. Greenville Shipbuilding Corp.,* 411 F.2d 279 (5th Cir. 1969). *Reed* and *Jackson* carve out an exception to § 5 which is limited to "the traditional remedies of the sea", *see Reed, supra* at 413, 83 S.Ct. at 1352—that is remedies against a shipowner, regardless of his status, for harm caused in the course of traditional shipping operations. Thus, the fact that the Court assumed that § 5 barred a direct negligence action on those facts is not inconsistent with the conclusion I reach today.

I am also unpersuaded by the argument the majority bases upon the precursors of *Reed* and *Jackson.* Given the reasoning of *Reed* and *Jackson,* I doubt it is proper to place much reliance on the "chain of logic" that led to the undermining of § 5. The *Reed-Jackson* Court, as I have noted, did not conceive of those cases as establishing a procedural shortcut. Indeed, since there presumably are situations in which a shipowner would have no right of indemnification against the employer, *Reed-Jackson* could not have proceeded on the assumption that the provision of a direct action against the employer made no economic difference in a case in which there was a third party in the background. But even if it is appropriate so to treat *Reed* and *Jackson,* I am not persuaded by the argument the majority offers for treating negligence and unseaworthiness claimants differently. A shipowner has the same basic right to indemnification whether the basis for his liability is negligence or unseaworthiness. *See Weyer-*

**244**

haeuser Steamship Co. v. Nacirema Operating Co., supra.[2] So even conceiving of *Reed* and *Jackson* as creating a procedural shortcut, I see no justification for a rule that they do not apply to negligence claimants.[3]

Because I disagree with the majority on the effect of § 5, I must address the issue the majority did not find it necessary to reach: whether the district court erred in concluding that plaintiffs failed to sustain their burden of producing evidence of the employer's negligence and in entering a judgment for the defendant at the close of plaintiff's evidence. I think this was error. Plaintiffs' expert testimony regarding the custom and practice of vessels during docking and undocking was, in my view, probably sufficient to satisfy plaintiffs' burden of production. In any case, the evidence was that Mr. Murphy was not warned in any manner that the vessel was about to pull away, and, in my view, that was sufficient evidence of the vessel's negligence to shift the burden of production to the defendant. I need not express any view on whether plaintiff may have been contributorily negligent and whether he might have been barred under the law of comparative negligence.

I would vacate the judgment of the district court and remand for a new trial.

2.  *Cooper Stevedoring Co. v. Fritz Kopke, Inc., supra* at 114–15, 94 S.Ct. 2174 is not inconsistent with *Weyerhaeuser.* It simply states *Halcyon's* rule regarding contribution, which, of course, is not the same thing as indemnification. *See Italia Societa v. Oregon Stevedoring Co., supra* at 321, 84 S.Ct. 748.

3.  I am satisfied that appellants were subject to the Act and will not address the related question whether the federal negligence remedy should be construed as subject to the limitations of the Massachusetts Workmen's Compensation Act.