John P. SIMKO, Administrator of the Estate of John R. Simko, III, Deceased and Luella Campbell Miller, on behalf of John R. Campbell, a minor, Plaintiffs,

v.

C & C MARINE MAINTENANCE CO., a corporation; American Commercial Barge Lines Company, a corporation, Defendants.

Civ. A. No. 74–172.

United States District Court, W. D. Pennsylvania.

Jan. 23, 1980.

Stanley M. Stein, Feldstein, Grinberg, Stein & McKee, Pittsburgh, Pa., for plaintiffs.

Bruce R. Martin, Pittsburgh, Pa., for C & C Marine Maintenance.

John W. Jordan, Giles J. Gaca, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., for American Commercial Barge Lines.

## OPINION

TEITELBAUM, District Judge.

The instant litigation, now approximately six years old, is apparently at last approaching the end of its long and perplexing journey. A very brief summary of already familiar facts in the form presented by the United States Court of Appeals for the Third Circuit is more than sufficient for purposes of understanding the issues remaining to be decided.

John Simko was hired by C & C Marine Maintenance Company (C & C) as a laborer. He was assigned the job of assisting in the cleaning and minor repair of barges brought to C & C's facilities along the Ohio River by a variety of barge companies. On March 11, 1972, some two weeks after his hiring by C & C, Simko was assisting in the cleaning of barge # 2699, owned by American Commercial Barge Lines Company (ACBL). While pulling on a water hose being used by another employee in washing ACBL # 2699's deck, Simko slipped and fell overboard. Despite efforts to throw him a line Simko was swept beneath barges moored nearby by the swift current and he drowned. His estate brought this wrongful death and survival action against both C & C and ACBL, seeking recovery under the Jones Act and the doctrine of unseaworthi-

ness. Both defendants denied liability under either claim, and ACBL crossclaimed against C & C for indemnity from any liability or expense incurred in defending the lawsuit that was attributable to C & C's breach of its implied warranty of workmanlike service in contracting to clean and repair barge # 2699.

The plaintiffs demanded a jury trial under both the Jones Act and maritime laws of this country, particularly the doctrine of unseaworthiness.

The jury returned a general verdict in favor of the plaintiffs on their Jones Act and unseaworthiness claims against C & C, in the amount of $61,000.00. The jury found in favor of ACBL on the plaintiffs' claim, and also found for ACBL on its crossclaim against C & C for indemnity. Following a non-jury trial on the amount of expenses incurred by ACBL in defending the lawsuit, this Court awarded ACBL $5,794.52 on its indemnity claim. In *Simko v. C & C Marine Maintenance Company and American Commercial Barge Lines Company,* 594 F.2d 960 (3rd Cir. 1979), the United States Court of Appeals for the Third Circuit affirmed the jury verdict rendered in favor of defendant ACBL on both the Jones Act claim and the unseaworthiness claim. Additionally, recovery against defendant C & C under the Jones Act claim was precluded based upon insufficiency of evidence. The only remaining viable legal theory recognized by the Court of Appeals, which could result in a recovery for plaintiffs, is the unseaworthiness claim against C & C. Being unable to determine from the general verdict whether the jury rendered decision based upon the impermissible Jones Act claim against C & C or the permissible unseaworthiness claim, remand was ordered to determine the merits of the unseaworthiness claim. Finding the unseaworthiness claim by itself not entitled to jury consideration, a determination of the claim must now be made by this Court rather than another jury. Lastly, the amount of damages awarded to ACBL on its indemnity claim must also be reevaluated in light of the Court of Appeals' opinion.

## UNSEAWORTHINESS

The Court of Appeals specifically set forth the issues to be determined by this Court. "On remand, the district court must first decide whether Simko was a temporary seaman aboard ACBL # 2699 within the meaning of *Sieracki.* If he was, it should then determine whether C & C was owner pro hac vice of that barge, as that term has been defined in this Circuit, . . and whether Simko's death was attributable to the unseaworthiness of that barge." 594 F.2d at 967–968. (Citations omitted).

The threshold issue, therefore, is whether or not Simko was a *Sieracki* seaman. *See Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Even though a longshoreman, Simko would be a *Sieracki* seaman while temporarily engaged in seaman's work. Whether or not Simko was temporarily engaged in seaman's work is governed by the standard enunciated by Judge Hastie in *Bryant v. National Transport Corporation,* 467 F.2d 139, 140 (3rd Cir. 1972):

"Normal maintenance activities that are the responsibility of a ship's crew include some repair work. A sensible and practical distinction can be and is ·drawn between repairs that can be and are likely to be made by seamen during the course of a voyage and repairs the nature and extent of which take them beyond the area of a seaman's normal responsibilities." (Citations omitted).

The evidence in the case *sub judice* suggests that Simko was primarily engaged in the cleaning and minor repair of barge # 2699. Such tasks being normal maintenance activities, this Court finds that Simko was a *Sieracki* seaman.

Even though a *Sieracki* seaman, Simko can recover damages from C & C only if C & C is found to be owner pro hac vice of barge # 2699 and thereby liable for an unseaworthy condition on such barge. The definition of owner pro hac vice generally accepted in this Circuit was first stated in *Aird v. Weyerhaeuser S. S. Co.,* 169 F.2d 606, 609–610 (3rd Cir. 1948), and later repeated in *Blair v. United States Steel Corporation,* 444 F.2d 1390 (3rd Cir. 1971):

"If the owner of the vessel has given entire possession and control of it to another by virtue of a demise charter or otherwise . . . the person thus put in possession and control of the vessel becomes special owner . . .. Such a person is frequently described as 'owner pro hac vice' which is merely a convenient expression to indicate that he stands in place of the owner for the voyage or service contemplated and bears the owner's responsibilities, even though the latter remains the legal owner of the vessel."

As defined, the pertinent characteristics of an owner pro hac vice are possession and control. More recently, the case of *Rao v. Hillman Barge and Construction Company,* 467 F.2d 1276 (3rd Cir. 1972), attempted to pinpoint the precise components of possession and control. Those components relied upon were:

1. whether or not the vessel was afloat,

2. whether or not the vessel was capable of being navigated, and

3. whether or not the vessel was moved by the alleged owner pro hac vice's employees.

An application of these standards to the evidence presented in the case *sub judice* indicates that C & C was owner pro hac vice of barge # 2699.

Turning first to the broad standard of *Blair, supra,* it is apparent that C & C had both possession and control of barge # 2699. The evidence indicates that barge # 2699 was delivered from the C & C facility to the Georgetown landing. C & C went to the Georgetown landing with its own vessel and took control of the barge, including its navigation up river to its own facility and back down river to the Georgetown landing when the purpose of C & C's possession was accomplished. C & C did not permit others to navigate the barge to its facility. C & C navigated the barge to and

from its facility under all circumstances and took complete possession and command of the vessel for the purpose of performing its maintenance and repair function. This fact situation is extremely similar, if not more compelling, than the facts in *Blair, supra.* In *Blair,* the barge was towed by a riverboat company to the alleged owner pro hac vice's dock in a river harbor. It was tied to the dock along with other barges and left in the alleged owner pro hac vice's possession for the purpose of loading it with pipe. After tying up the barge, the boat company left the area. Barge handlers, employed by the alleged owner pro hac vice, were responsible for movement of the vessel from various locations in the harbor by means of pulleys. Moreover, the more recent test of *Rao, supra,* yields the same result. Barge # 2699 was afloat, was capable of being navigated, and was in fact moved by C & C's employees. Accordingly, this Court finds that C & C was owner pro hac vice of barge # 2699, as that term has been defined in this Circuit.[1]

▉ Having concluded that Simko was a *Sieracki* seaman and that C & C was owner pro hac vice of ACBL barge # 2699, the Court's attention now turns to whether Simko's death is attributable to the unseaworthiness of barge # 2699. A seaworthy vessel is one which is in a fit and proper state as to construction, equipment, appliances, personnel and in all other respects considering the use to which the vessel is being put. Plaintiffs' primary contention in this regard is that barge # 2699 was unseaworthy due to improper equipment. Specifically, plaintiff contends that available life saving equipment was inadequate.

▉ The evidence indicates that Simko remained on the surface of the water for ten seconds after falling overboard. The closest life ring available was located some fifty feet from the end of the barge where

---

1. Those cases such as *Rao, supra,* and *Specht v. Pittsburgh Coal Co.,* 432 F.Supp. 717, 722 (W.D.Pa.1975), holding that certain defendants are not owners pro hac vice involve vessels which had been removed from the water and were resting on cradles in dry dock. This is significantly different from the case *sub judice,* where barge # 2699 was in the water, capable of being navigated at any particular time, and was actually navigated under the control of C & C.

Simko had been working. Spike poles, another form of life saving equipment, were located no closer than seventy feet from where Simko went into the water. Furthermore, Simko's fellow employees had never been instructed in the use of the safety equipment and it had never been determined how fast any of the employees could run from water's edge to the location of the nearest available safety equipment. The only assistance offered to Simko was by means of a rope thrown in his direction. The rope was used because there was no other rescue equipment in the vicinity and its use proved ineffective. When placing life saving equipment on barge # 2699, C & C should have placed such equipment where it could have been obtained rapidly. With Simko being able to stay afloat for approximately ten seconds, the immediate availability of appropriate life saving equipment would have likely saved his life. Accordingly, this Court finds that Simko's death was attributable to the unseaworthiness of barge # 2699.

Having found that Simko was a *Sieracki* seaman aboard ACBL's barge # 2699, that C & C was owner pro hac vice of that barge, and that Simko's death was attributable to the unseaworthiness of barge # 2699, this Court will enter judgment in favor of plaintiff and against defendant C & C in the amount of $61,000.00, in accordance with the previous jury verdict in the case *sub judice.*

*INDEMNITY*

█ As previously mentioned, this Court awarded ACBL $5,794.52 on its indemnity claim. In doing so, however, no distinction was made between expenses incurred in defending plaintiff's action and expenses incurred in prosecuting the indemnity claim itself. The Court of Appeals concluded that ACBL should be indemnified with an award of attorneys fees only for those hours expended in defending plaintiffs' law suit against it and not for those hours expended in pursuing and protecting the indemnity

claim itself. *See Burris v. Global Bulk Carriers Inc.,* 505 F.2d 1173, 1178 n. 8 (3rd Cir. 1974). This Court must now attempt to apportion the expenses incurred by ACBL during the lawsuit, and base its fee award only on those hours which may reasonably be said to have been devoted to ACBL's defense of plaintiffs' claim.

ACBL's indemnity claim requests $5,954.08 for the defense against plaintiffs' claim. Defendant C & C contends that counsel for ACBL has failed to prove that the entire claimed fees are attributable to work in defense of plaintiffs' claim. Testimony of Attorney John Jordan carefully distinguishes between the time he spent prosecuting the indemnity claim and time spent in defending against plaintiffs' main claim. This Court, therefore, has no reluctance in permitting Mr. Jordan's contended fee of $3,015.93.[2] The requested fees of Attorney Giles Gaca present a more disturbing problem. Mr. Gaca testified at the most recent hearing on the indemnity claim held on December 11, 1979, that expenses incurred solely in defense of plaintiffs' claim amounted to $2,938.15. However, at the previous hearing on the indemnity claim held on October 14, 1977, Mr. Gaca indicated that he had no separate insertions in his time records which would indicate time for the indemnity issue as opposed to time in defense against plaintiffs' claim. He testified that the defense against plaintiffs' claim and the indemnity claim were so intermingled that he could not differentiate between time spent on each separately. Under these circumstances, Mr. Gaca's requested fees must be strictly scrutinized for accuracy. The starting point for this Court is a recognition that Mr. Gaca's requested fee appears to be reasonable. While the case in chief dwarfed the indemnity issue, Mr. Gaca has only requested $2,938.15 out of the total billing for his time of $4,251.00. This rather conservative request is a result of Mr. Gaca attributing expenses to the

---

2. Implicit in the award of $3,015.93 is a finding by this Court that time spent by Mr. Jordan in opposing defendant C & C's "jurisdictional" argument was time spent in opposition to

plaintiffs' claim. The "jurisdictional" argument posed a direct threat to ACBL's defense verdict. *See Simko v. C & C Marine Maintenance Company,* 594 F.2d 960 at 965.

indemnity claim where he is specifically unable to differentiate. The reasonableness of the fee requested along with Mr. Gaca's willingness to forego fees for any time not clearly attributable to defense against plaintiffs' claim persuades this Court that the award of $2,938.15 for his services is appropriate. The absence of independent time records has resulted in a fee lower than that to which Mr. Gaca is probably entitled. Preclusion of his entire fee, as contended for by defendant C .& C, is unwarranted where C & C has received the benefit of each and every area of uncertainty. Accordingly, Mr. Gaca's fee awarded is $2,938.15, which in addition to Mr. Jordan's awarded fee of $3,015.93, results in a total award of $5,954.08.

## SUMMARY

In accordance with the foregoing Opinion, judgment will be entered in favor of plaintiffs and against defendant C & C in the amount of $61,000.00. On the indemnity claim, judgment will be entered in favor of defendant ACBL and against defendant C & C in the amount of $5,954.08. The foregoing shall constitute findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). An appropriate order will issue.