Roland J. BERNIER and Desneige L. Bernier, Plaintiffs,

v.

JOHNS–MANVILLE SALES CORP., et al., Defendants.

Ellis M. MOORE and Celia Moore, Plaintiffs,

v.

JOHNS–MANVILLE SALES CORP., et al., Defendants.

Raymond E. JONES and Frances Jones, Plaintiffs,

v.

JOHNS–MANVILLE SALES CORP., et al., Defendants.

RAYBESTOS–MANHATTAN, INC., Defendant and Third-Party Plaintiff,

v.

BATH IRON WORKS CORPORATION, Third-Party Defendant.

Civ. Nos. 78–98 P, 79–55 P, 81–0045 P and 79–73 P.

United States District Court, D. Maine.

Aug. 9, 1982.

G. William Higbee, McTeague, Higbee & Libner, Brunswick, Me., for plaintiffs.

Phillip D. Buckley, Rudman & Winchell, Bangor, Me., for Johns-Manville Sales Corp.

Thomas R. McNaboe, Thompson, Willard & McNaboe, Portland, Me., for Raybestos-Manhattan.

Robert F. Hanson, Norman & Hanson, Portland, Me., for Bath Iron Works.

MEMORANDUM OF OPINION AND ORDER OF THE COURT

GIGNOUX, Chief Judge.

Plaintiffs in these three actions have brought suit against various manufacturers

and suppliers cf asbestos-containing products for injuries allegedly sustained from exposure to their products while employed at Bath Iron Works (BIW), a privately-owned shipyard in Bath, Maine. Plaintiffs seek recovery of compensatory and punitive damages on theories of negligence, breach of warranty, and strict liability. Jurisdiction is predicated on diversity of citizenship. 28 U.S.C. § 1332(a).

One of the defendants, Raybestos-Manhattan, Inc. (R–M), has filed in each action a third-party complaint against BIW seeking contribution and indemnity. Presently before the Court is a motion for summary judgment filed by BIW pursuant to Fed.R. Civ.P. 56, in support of which BIW asserts that the third-party action is barred by the exclusive liability provision of Section 5(a), 33 U.S.C. § 905(a), of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.*[1] The record consists of the pleadings, affidavits, answers to interrogatories, deposition excerpts, and admissions on file.

Each of the third-party complaints, which are identical, contains six counts. The theories of recovery against BIW asserted by R–M in the first five counts have previously been rejected by this Court. *See Austin v. Johns-Manville Sales Corporation,* 508 F.Supp. 313 (D.Me.1981). Undaunted by the Court's prior ruling, R–M in Count VI of the present third-party complaint seeks contribution and indemnity by BIW on the theory that BIW was the owner *pro hac vice* of the vessels under construction or undergoing repair in its yard on which plaintiffs worked, and is therefore subject to liability for negligence under Section 5(b) of the LWHCA, 33 U.S.C. § 905(b).

For the reasons to be stated, the Court has concluded that BIW was not during the

relevant periods the owner *pro hac vice* of vessels being constructed or repaired in its yard and that the cause of action asserted in Count VI of R–M's third-party complaints is therefore barred by Section 5(a) of the LHWCA.[2] BIW's motion for summary judgment is therefore granted.

## I.

### The Facts

The record presently before the Court discloses that plaintiff Roland Bernier, now deceased, worked for BIW as a boiler assembler from 1942 to 1945; plaintiff Ellis Moore worked as a pipe coverer from 1942 to 1945 and from 1956 to 1973; plaintiff Raymond Jones has worked as a pipe coverer from 1955 to the present time. The record does not indicate specifically on which vessels these employees worked. Generally, during the period of their employment, however, BIW constructed new vessels and repaired or overhauled additional vessels for the United States Navy and for commercial shipowners. The record shows the following with respect to the control assumed by BIW over vessels being constructed or overhauled in its yard.

### A. U. S. Navy Vessels

When BIW undertakes to construct or overhaul a ship for the U. S. Navy, the parties enter into a detailed contract which sets forth procedures and schedules to be followed during all phases of the work, and which defines the rights and duties of both parties. Generally, the contracts provide that BIW is responsible for adopting and enforcing adequate health and safety regulations (at a minimum meeting OSHA regulations) and that Navy personnel have access to the vessels undergoing construction or repair.[3] BIW does not hold legal title to

[1]. It is undisputed that the plaintiff employees were covered by LHWCA and have received workers compensation benefits under the Act.

[2]. In light of the Court's determination that BIW was not an owner *pro hac vice* of the vessels upon which the plaintiff employees may have worked, it is unnecessary to consider the other grounds asserted by BIW in support of its summary judgment motion.

[3]. *See* R–M Exhibit E at art. 17, 20; Exhibit J, at art. J–38, J–42. A 1948 contract to construct an experimental Motor Torpedo Boat also required BIW to purchase collision insurance to cover operation of the vessel during the test runs. *See* R–M Exhibit K at art. 14. This requirement has not appeared, however, in more recent construction or repair contracts.

any newly constructed or overhauled naval vessel at its facility.[4]

To oversee and administer the contract, the Navy maintains a permanent office at BIW. The Supervisor of Shipbuilding with a staff of over 200 closely monitors the work under the contracts. The Supervisor may unilaterally order changes in the contracts, or stop work.[5] Any movement of the ships at the yard requires advance notification and approval of the Supervisor.[6] The Supervisor and his staff inspect work regularly; attend all tests performed pursuant to the contracts; determine whether and when trial runs of the vessels will take place; and closely monitor the trial runs.[7] The Supervisor also acts as squadron commander of all ships in the yard.

### 1. New Construction

Construction of a new vessel begins in the BIW yard with fabrication of the hull, laying of the keel, and installation of the propulsion machinery.[8] When the hull is launched, the various combat and operation systems are installed.[9] BIW workcrews are, of course, in control of the launched hull while work is in progress. Navy personnel, however, have unlimited access and closely supervise the progress of the work. Asbestos insulation is done after the hull is launched.[10]

If any ship must be moved from berth to berth within the yard during the course of construction, BIW must notify the Supervisor and obtain his permission. Tugs hired by BIW, sometimes assisted by a small BIW boat, do the principal moving.[11]

Subsequent phases of construction specified in the contract call for testing of the vessel, which requires that it be operated. Two types of builder's trials are performed: "dock" trials and "sea" trials.

Dock trials involve testing the ship's systems while it is secured to the dock. BIW draws up a proposed agenda and submits it to the Supervisor for his approval. The proposed agenda outlines in detail the specific tests to be performed, and the manner and schedule of implementation.[12] The Supervisor reviews the proposed agenda, determines whether a dock trial is appropriate at that time, and then makes any modifications in the proposed agenda deemed necessary.[13] BIW personnel conduct the trial in strict accordance with the final agenda while the Supervisor's representatives closely monitor the trial.

Sea trials involve taking the new vessel to sea for several days to determine whether the contract specifications have been met. Again, BIW draws up a proposed trial agenda and submits it to the Supervisor for comment and approval.[14] These agenda schedule in minute detail the tests to be performed as well as all vessel maneuvers.[15] BIW employees drawn from the various departments comprise the vessel's crew, and BIW's yard captain, William Rich, serves as the captain. The Supervisor reviews and approves the crew list. Although the BIW captain and crew actually operate the vessel during a trial, they follow strictly the schedule of the agenda, which even prescribes the order of firing engines and vessel speed.[16] The Navy rep-

---

4. Affidavit of William F. Mussenden, ¶¶ 3, 4, 5.

5. *See* Supplemental Affidavit of William F. Mussenden, ¶¶ 2, 3.

6. *See* Affidavit of William Rich, ¶ 6.

7. *See* Affidavit of William Rich, ¶¶ 6–10, 13–16; Third-Party Defendant's Exhibit C, at 2002–09.

8. *See* Third-Party Plaintiffs' Exhibit J, at art. J–49.

9. *Id.;* Deposition of John R. Newell, at 54–55.

10. Deposition of John R. Newell, at 54–55.

11. Deposition of John R. Newell, at 59.

12. Affidavit of Cecil Fullerton, ¶¶ 7, 8.

13. *Id.*

14. Affidavit of William Rich, ¶¶ 9, 10; Affidavit of Cecil Fullerton, ¶¶ 7, 8.

15. Affidavit of William Rich, at appendix B and C.

16. *See* Affidavit of William Rich, at ¶ 16, appendix B and C.

resentatives aboard the vessel during these trials have authority to modify a trial in progress, and even to terminate a trial.

Upon successful completion of the builder's trials, the contracts call for a "preliminary acceptance" trial. This trial essentially repeats the sea trial and serves as the final trial run before delivery of the vessel to the Navy. BIW submits a proposed trial agenda to both the Supervisor and to the Navy Board of Inspection and Survey (INSURV) in advance of the trial. INSURV determines whether a trial is appropriate; makes desired modifications in the agenda; and finally approves the trial.[17] As with the earlier sea trial, BIW submits for approval a list of crew members. Representatives of the Supervisor and INSURV monitor operation of the ship, and have authority to modify or terminate the trial.

Delivery is the final stage of BIW responsibility under a contract. Although at the present time, the Navy accepts vessels at BIW's facility, prior to 1969 BIW delivered the vessels to the Boston Naval Shipyard. Again, approved BIW employees comprised the crew and Rich was the captain; representatives of the Supervisor and other naval personnel, including some of the vessel's prospective officers were aboard during the trips to Boston.[18]

### 2. Repair and Overhaul

Navy ships that are brought to Bath for repair and overhaul fall into one of two categories. Some vessels remain commissioned during the repair period. The officers and crew of these vessels stay with the ship during the period. The Navy crew controls access to the ship and is responsible for security. Regular watches are maintained, as are the ship logs. The Navy crew mans the vessel during all trials, and may assist in some of the repair work. R–M

concedes that BIW is not the owner *pro hac vice* of Navy vessels which remain commissioned.

Vessels which require more extensive overhaul customarily are "decommissioned" shortly after arrival at the yard. When the vessels arrive, they are delivered over to the custody of the Navy Supervisor. The crew is gradually dismissed in phases and reassigned to duty on other ships. The logs are removed. When the contract work is ready to proceed, the Supervisor turns the vessel over to BIW in accordance with the contract. Six months before completion of the contract work, a nucleus crew of officers returns to the shipyard; one month before completion, a skeleton enlisted crew arrives. The ship is recommissioned after completion of the contract work and delivery to the Navy.

The contracts require that BIW make adequate provisions for security and for the health and safety of workers during the repair period, and that Navy personnel at all times have access to vessels undergoing repair. Once the overhaul and repair work nears the appropriate stage, the same dock, sea and preliminary acceptance trials described above with respect to newly constructed vessels are performed on the overhauled vessels.

### B. Commercial Vessels

The procedure for construction and overhaul of commercial vessels parallels closely that for naval vessels. BIW negotiates a contract with the owner that prescribes in similar detail the work to be done, the manner in which it is to be done, and the schedule for completing the various stages of the work. The owner maintains a representative at the shipyard during all phases of the contract work. This so-called owner's representative and his assistants monitor BIW's performance under the contract

---

**17.** *See* Affidavit of Cecil Fullerton, ¶ 9.

**18.** The record also indicates that prior to its acquisition of drydock facilities in 1980 BIW subcontracted sub-waterline painting work to other shipyards along the East coast. Trips to these facilities were conducted in the same manner as the sea trials discussed above. Per-

mission to make the trip was secured in advance from the Supervisor. Rich was the captain; approved BIW employees were the crew; Supervisor personnel attended and tested the ship's systems. Navy representatives approved of the drydock facilities before docking. *See* Affidavit of William Rich, at ¶ 19.

in the same manner that the Navy Supervisor and his staff monitor Navy contracts.[19] When required to move vessels in the yard from berth to berth, BIW notifies and obtains permission from the owner's representative.[20]

Dock and sea trials are conducted in the same manner for newly constructed commercial vessels as for naval vessels.[21] Rich is the captain; BIW employees are the crew. Although the BIW employees actually man and operate the vessel during all phases of a trial, they do so strictly in accordance with the trial agenda, which sets out fully and precisely all maneuvers to be undertaken. The owner's representative and his staff must approve all agendas; are present during the trials; and have authority to modify a trial while in progress or to terminate the trial and order a return to port.[22]

Upon completion of the new construction or overhaul, the vessel is delivered to the owner at the BIW shipyard. BIW does not hold legal title to any newly constructed or overhauled commercial vessel at any time.[23]

## II.

### The Law

Under Section 5(b) of the LHWCA, an employee may sue a "vessel" for its negligence.[24] The term "vessel" is defined by Section 2(21) of the Act to include "said vessel's owner, *owner pro hac vice, agent,* operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21) (emphasis added).[25] R–M contends that BIW, although concededly not the owner of vessels undergoing construction or repair in its shipyard, is the owner *pro hac vice* of such vessels; is a "vessel" as defined by Section 2(21); and therefore, in its capacity as a "vessel," is subject to liability to its employees for negligence under Section 5(b). *See, e.g., Reed v. The Yaka,* 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963); *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31 (3rd Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). There is no question that as a compensation-paying employer, BIW is immune, by reason of Section 5(a) of the LHWCA, from third-party claims for contribution, at least to the extent that, as an employer, it is immune from common law liability to its employees. *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.,* 342 U.S. 282, 285–86, 72 S.Ct. 277, 279–80, 96 L.Ed. 318 (1952); *Austin v. Johns-Manville Sales Corp., supra,* 508 F.Supp. at 315. Thus, the parties agree that BIW may be found liable for contribution to R–M only if BIW, as a "vessel," could be found liable to the plaintiff employees. *See Griffith v. Wheeling Pittsburgh Steel Corp., supra,* 521 F.2d at 44.

Although the LHWCA does not define "owner *pro hac vice,*" the governing

**19.** Affidavit of William Rich, ¶ 22.

**20.** *Id.* at ¶ 23.

**21.** Sea trials were not conducted on the few commercial vessels which BIW overhauled from 1950 to the present time. Most of BIW's commercial work involved new construction. *See* Deposition of William F. Mussenden, ¶ 2.

**22.** Affidavit of William Rich, ¶¶ 24–26; Affidavit of Edward Atkinson, ¶¶ 3–6.

**23.** Affidavit of William F. Mussenden, ¶¶ 4, 5.

**24.** Section 5(b) provides in relevant part as follows:
(b) In the event of injury to a person covered under this chapter caused *by the negligence of a vessel,* then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such a vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.
33 U.S.C. § 905(b) (emphasis added).

**25.** Section 2(21) reads as follows:
(21) The term "vessel" means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, *and said vessel's* owner, *owner pro hac vice,* agent, operator, charter or bare boat charterer, master, officer, or crew member.
33 U.S.C. § 902(21) (emphasis added).

legal principles are well settled. As owner *pro hac vice* is one who assumes by charter or otherwise "exclusive possession, control, command, and navigation" of a vessel for a specific period of time. *Stephenson v. Star-Kist Caribe, Inc.,* 598 F.2d 676, 679 (1st Cir. 1979); *Guzman v. Pichirilo,* 369 U.S. 698, 699, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962); G. Gilmore & C. Black, Jr., *The Law of Admiralty,* 239–43 (2d ed. 1975). An owner *pro hac vice* "has complete—though perhaps only temporary—dominion over the vessel entrusted to him. He commands her navigation and is entitled to avail himself fully of her services." *Olsen v. Todd Shipyards Corp.,* 435 F.Supp. 568, 571 (W.D. Wash.1977). "It is therefore tantamount to, though just short of, an outright transfer of ownership." *Guzman v. Pichirilo, supra,* 369 U.S. at 700, 82 S.Ct. at 1096.

■ It is clear on the instant record that BIW did not assume the kind of exclusive control over vessels being constructed or repaired in its yard to have made it the *pro hac vice* owner thereof. BIW's dominion over these vessels was confined to the narrow sphere of carrying out its obligations under its construction or repair contracts. Control of the vessel clearly remained with the United States Navy or the private shipowner. BIW could not, for example, use a vessel for its own commercial ventures or for any other purpose normally within the prerogative of an owner. *Compare Olsen v. Todd Shipyards Corp., supra,* 435 F.Supp. at 571, *with Griffith v. Wheeling Pittsburgh Steel Corp., supra,* 521 F.2d 31 *and Blair v. United States Steel Corp.,* 444 F.2d 1390 (3rd Cir. 1971) (per curiam), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 681, 30 L.Ed.2d 666 (1972). BIW's control over the vessels was tightly circumscribed by the contracts and was subject to the owner's ultimate authority. BIW could not move vessels within the yard without first obtaining approval from either the United States Navy Supervisor or the private owner's representative. Although BIW crews manned the vessels during the dock, sea and acceptance trials, operation of the vessels during these trials was mandated by contract and was strictly in accordance with agendas approved by the Supervisor or the owner's representative. In short, the full-time presence of the Navy Supervisor or private owner's representative; the constant inspection and supervision of the work by the Supervisor or owner's representative; and the authority of the Supervisor or owner's representative to order changes in the work or to stop work entirely plainly establish that BIW did not have the type of exclusive "control" over these vessels which is required for *pro hac vice* ownership. *Accord, Bossard v. Port Allen Marine Service, Inc.,* 624 F.2d 671, 672–73 (5th Cir. 1980) (per curiam); *Hess v. Port Allen Marine Service, Inc.,* 624 F.2d 673, 674 (5th Cir. 1980) (per curiam); *Rao v. Hillman Barge & Construction Co.,* 467 F.2d 1276, 1277 (3rd Cir. 1972) (per curiam); *Bailey v. Johns-Manville Sales Corp.,* Civ. No. 76–155–NN, slip op. at 5 (E.D.Va. Feb. 12, 1982); *Olsen v. Todd Shipyards Corp., supra,* 435 F.Supp. at 571–72, 572 n.15. *But see Simko v. C & C Marine Maintenance Co.,* 484 F.Supp. 401, 403–04 (W.D.Pa.), *aff'd,* 639 F.2d 772, 775 (3rd Cir. 1980).

The Court holds that BIW was not the owner *pro hac vice* of vessels being constructed or repaired in its yard during the periods of time these plaintiffs were employed by BIW; that BIW was not a "vessel" within the meaning of Section 2(21) of the LHWCA; and that therefore BIW is not subject to liability to R–M for contribution and indemnity under Section 5(b) of the Act.

### III.

### ORDER

The Court being persuaded that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that BIW is entitled to a judgment as a matter of law, Fed.R.Civ.P. 56(c), BIW's motion for summary judgment dismissing R–M's third-party complaints in the above-entitled actions is granted and the Clerk of this Court is directed to enter judgment forthwith dismissing said third-party complaints with prejudice.

IT IS SO ORDERED.